## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| PASTOR BENJAMIN A. JOHNSON, DR. RONALD A. LUNDEEN, LARRY D. CARTFORD, and PASTOR ARTHUR F. HAIMERL on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE EVANGELICAL LUTHERAN CHURCH IN AMERICA and THE EVANGELICAL LUTHERAN CHURCH IN AMERICA BOARD OF PENSIONS,<br><br>Defendants. | Court File No. 11-cv-00023 (MJD-LIB)<br><br>**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................... 1

II.    BACKGROUND ...................................................................................... 3

    A.    The Board Has The Responsibility For Managing Plan Investments And ELCA Has Only Settlor Functions ........................................................ 4

    B.    The Plan Is A Defined Contribution Plan With Assets (Including Those Held In The Participating Annuity Fund) Subject To Market Performance ........................................................................................ 6

    C.    The Plan And Related Documents Disclose That Benefits Are Subject To Market Performance ................................................................. 9

    D.    Beginning In 2007, The Nation Confronted Catastrophic Declines In The Market And Global Economy ........................................................... 10

    E.    The Board Responded To The Economic Crisis By Decreasing Benefits In Order To Preserve The Viability Of The Fund ....................... 13

III.    STANDARD OF REVIEW .................................................................... 13

IV.    ARGUMENT ......................................................................................... 14

    A.    ELCA Should Be Dismissed From This Lawsuit Because There Is No Plausible Basis For Contending That ELCA Made The Challenged Fiduciary Decisions ............................................................. 14

        1.    No allegations support a plausible claim that ELCA made the challenged fiduciary decisions ....................................................... 14

        2.    Plaintiffs' alter ego theory against ELCA also fails ....................... 17

    B.    The Board Should Be Dismissed From This Lawsuit Because It Fulfilled Its Fiduciary Obligation To Preserve The Participating Annuity Fund ...................................................................................... 19

    C.    A Request For Injunctive Relief Does Not State A Cause Of Action ....... 24

V.    CONCLUSION ...................................................................................... 24

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Aguilera v. Pirelli Armstrong Tire Corp.*,
   223 F.3d 1010 (9th Cir. 2000) ................................................................... 24

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009) ...................................................................... 14, 17

*Bd. of Public Works, City of Blue Earth, Minn. v. Wis. Power & Light Co.*,
   613 F. Supp. 2d 1122 (D. Minn. 2008) ........................................................ 4

*Bohan v. Honeywell, Int'l*,
   2002 WL 31767786 (D. Minn. Dec. 9, 2002) ............................................... 14

*Burger King Corp. v. Mason*,
   710 F.2d 1480 (11th Cir. 1983) ................................................................. 24

*Buse v. Vanguard Grp. of Inv. Companies v. Skinner*,
   1996 WL 744899 (E.D. Pa. Dec. 23, 1996) .................................................. 23

*Crocker-Citizens Nat'l Bank v. Younger*,
   4 Cal.3d 202 (Cal. 1971) ........................................................................ 23

*Curtiss-Wright Corp. v. Schoonejongen*,
   514 U.S. 73 (1995) ................................................................................ 16

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005) .............................................................................. 24

*Hughes Aircraft Co. v. Jacobson*,
   525 U.S. 432 (1999) .............................................................................. 16

*In re Great N. Iron Ore Properties*,
   263 N.W.2d 610 (Minn. 1978) ................................................................. 22

*In re HomeBanc Corp. Sec. Litig.*,
   706 F. Supp. 2d 1336 (N.D. Ga. 2010) ....................................................... 10

*In re Huntington Bancshares Inc. ERISA Litig.*,
   620 F. Supp. 2d 842 (S.D. Ohio 2009) ....................................................... 11

## TABLE OF AUTHORITIES
### (continued)

Page

*In re Trusteeship under Agreement with Mayo*,
  105 N.W.2d 900 (Minn. 1960) ............................................................. 22, 23

*Jacobs v. Bean,*
  108 A.2d 559 (N.H. 1954) ........................................................................ 23

*Lockheed Corp. v. Spink*,
  517 U.S. 882 (1996) ................................................................................. 16

*Minn. Indus. Ventures, LLC v. City of Roseville*,
  No. 052488-RHK-JSM, 2006 WL 763208 (D. Minn. Mar. 24, 2006).......... 24

*Noble Sys. Corp. v. Alorica Cent., LLC*,
  543 F.3d 978 (8th Cir. 2008) ..................................................................... 4

*Norwest Bank v. Beckler*,
  663 N.W.2d 571 (Minn. Ct. App. 2003) .............................................. 20, 22

*Nw. Nat'l Bank of Minneapolis v. Balch*,
  31 N.W.2d 20 (Minn. 1948) ...................................................................... 23

*Rhodes v. Houston*,
  202 F. Supp. 624 (D. Neb. 1962) .............................................................. 17

*Sarlin v. Sarlin*,
  430 S.E.2d 530 (Ct. App. 1993) ................................................................ 23

*Schaaf v. Residential Funding Corp.*,
  517 F.3d 544 (8th Cir. 2008) .................................................................... 24

*Schultz v. Windstream Commc'ns, Inc.*,
  600 F.3d 948 (8th Cir. 2010) .................................................................... 16

*Stoe v. D.W. Jones Mgmt., Inc.*,
  No. 09-2672, 2010 WL 502780 (D. Minn. Feb. 5, 2010) ........................... 16

*Third Nat'l Bank v. Impac, Ltd.*
  432 U.S. 312 (1977) ................................................................................. 10

*Thorkelson v. Publishing House of the Evangelical Lutheran Church in America*,
  No. 10-1712, 2011 WL 291930 (D. Minn. Jan. 27, 2011) .......................... 18

## TABLE OF AUTHORITIES
### (continued)

**Page**

*United States v. Bonanno Organized Crime Family*,
   683 F. Supp. 1411 (S.D.N.Y. 1988) ............................................................. 16

*Varity Corp. v. Howe*,
   516 U.S. 489 (1996) ..................................................................................... 23

*Victoria Elevator Co. of Minneapolis v. Meriden Grain Co., Inc.*,
   283 N.W.2d 509 (Minn. 1979) ..................................................................... 18

*Warren E. Johnson Companies v. Unified Brand, Inc.*,
   735 F. Supp. 2d 1099 (D. Minn. 2010) ........................................................ 14

**Statutes**

Minn. Stat.
   § 501B.81 ...................................................................................................... 16
   § 501B.151 subd. 1(a) ....................................................................... 15, 20, 22

**Rules and Regulations**

Federal Rule of Civil Procedure
   12(b)(6) .................................................................................................. 13, 14

**Other Authorities**

*Bush Signs Bailout After House Votes Yes*, David M. Herszenhorn,
   New York Times (Oct. 3, 2008) .................................................................... 12

*Fed's $85 Billion Loan Rescues Insurer*,
   Edmund L. Andrews, *et al*., New York Times (Sept. 16, 2008) ................... 12

*Lehman Files for Bankruptcy; Merrill Is Sold,* Andrew Ross Sorkin,
   New York Times (Sept. 14, 2008) ................................................................ 11

*Pension Plans Lose Trillions*,
   Julie Hirschfeld Davis, ABC News (Oct. 7, 2008) ....................................... 12

Public Employees Retirement Association of Minnesota,
   *Pension Myth vs. Pension Fact* .................................................................... 12

*Regulators Seize Mortgage Lender*,
   Louis Story, New York Times (July 14, 2008) ............................................. 12

**TABLE OF AUTHORITIES**
(continued)

Page

*Steep Market Drops Highlight Despair Over Rescue Efforts*,
   Floyd Norris, New York Times (March 1, 2008)........................................................11

*Tough Times May Force Changes in Minnesota Pension Funds*, Pat Doyle,
   Minneapolis-St. Paul Star Tribune (Dec. 10, 2008) .....................................................12

*U.S. to Buy Stakes in Nation's Largest Banks,*
   Deborah Solomon, *et al.,* Wall Street Journal (Oct. 14, 2008) ...................................12

**Treatises**

5 Charles A. Wright *et al.*,
   Fed. Practice & Proc.
   § 1248 (3d ed. 2010).....................................................................................................17

Restatement (Second) of Trusts
   § 165 (1959)..................................................................................................................23
   § 201 (1959)..................................................................................................................15

Restatement (Third) of Trusts
   § 79 (2007)....................................................................................................................22

Defendants submit the following memorandum in support of their motion to dismiss plaintiffs' Second Amended Complaint ("complaint" or "SAC").

## I.      INTRODUCTION

Defendant Evangelical Lutheran Church in America ("ELCA") is a Minnesota nonprofit corporation organized and operated exclusively for religious purposes. Evangelical Lutheran Church in America is also the name applied to the denomination, which is one of the largest religious organizations in the United States.  Defendant Board of Pensions of Evangelical Lutheran Church in America (misnamed in the caption as the Evangelical Lutheran Church in America Board of Pensions) is a separate Minnesota nonprofit corporation (the "Board").  The Board exists to fulfill ELCA's ministry of offering retirement and health benefits to persons employed in mission for Christ throughout the congregations, synods, institutions and agencies affiliated with the denomination.

The complaint faults the Board's management of the Evangelical Lutheran Church in America Retirement Plan ("Plan") during the crippling national economic recession that began in 2007.  Plaintiffs assert claims for breach of contract and breach of fiduciary duty against ELCA and the Board.  Plaintiffs base both counts on the allegations that defendants promised that "**Plaintiffs' annuity payments were guaranteed for life** and also that **increases in these guaranteed lifetime annuity payments would be permanent**." SAC ¶ 1 (emphasis in original).  These claims should be dismissed as a matter of law.

The complaint pleads that ELCA had "responsibility" for the Plan based on

ELCA's retirement plan settlor functions and because the ELCA Churchwide Assembly elects the Board's trustees.  Nowhere does the complaint plead that ELCA made, or had a fiduciary role with respect to, the decisions plaintiffs challenge.  *Lockheed Corp. v. Spink*, 517 U.S. 882, 891 (1996) (adoption, modification, or termination of pension plans are not fiduciary acts but analogous to "those of the settlors of a trust") (citation omitted); *Schultz v. Windstream Commc'ns, Inc.*, 600 F.3d 948, 951-52 (8th Cir. 2010).  The Plan documents designated those administrative and fiduciary duties explicitly as the work of the Board.  Because the Board as Plan investment fiduciary made the decisions at issue here, only the Board (which acted properly) is responsible.

The complaint further alleges that ELCA is the alter ego of the Board – allegations that make no sense where the law distinguishes between settlor and fiduciary functions. While related, ELCA and the Board are separate corporations, and the roles and corporate formalities of each with respect to all of their ministries and the Plan are distinct in legally dispositive ways.  Even if plaintiffs' allegations concerning corporate relationships were accurate, nowhere do plaintiffs allege that ELCA misused or ignored corporate formalities as required in order to pierce the corporate veil and impose liability on ELCA.

As to the Board, the complaint's allegations regarding participating annuities being "guaranteed for life" make no sense.  The annuities continue to be paid and there is no allegation anywhere that they have been or will be discontinued.  The crux of this case is the complaint's contentions that the Board promised that the Participating Annuity and Bridge Fund ("Participating Annuity Fund" or "Fund") would defy gravity – only go up

and never come down.  As demonstrated below, the complaint's contentions misread statements contained in Summary Plan Descriptions ("SPDs") relating to "permanent increases" to participants' annuities.  Such increases did not immunize the account from market fluctuation, but rather increased the base annuity entitlement.  After an increase, the "participating" annuitants continued to "participate" in both market gains and losses, not just the gains.

By reducing annuity payments to reflect market performance, the Board discharged its responsibilities precisely for the purpose of preserving lifetime annuities of Participating Annuity Fund participants.  The Board's stewardship occurred during the worst financial crisis since the Great Depression, which doomed to bankruptcy household-name financial institutions and other corporations and prompted the federal government to pass a $700 billion stimulus package to keep the nation's economy from collapsing.  At the end of the day, the Board fiduciaries were bound by trust principles to administer the trust and the Plan to effectuate the settlor's intent of providing retirement benefits throughout Plan participants' lifetimes – as the complaint itself pleads.  The Board accomplished this goal, and the complaint fails to state a claim upon which relief can be granted.

## II.   **BACKGROUND**[1]

Plaintiffs Johnson, Lundeen, Cartford and Haimerl are Plan participants whose

---

[1] For purposes of this motion only, defendants take the allegations of the complaint as true to the extent not controverted by incorporated documents or information in the public record.

church-affiliated employers made contributions to the Plan.  SAC ¶¶ 3, 8, 10, 15, 17, 18, 20.  The complaint alleges that they elected[2] to receive their retirement accumulations from the Participating Annuity Fund in 1995, 2001 (deferring receipt until 2007), 2002 and 2000 when they (respectively) retired.  *Id.* at ¶¶ 7-10.  Plaintiffs seek to sue on behalf of a class of participants who elected from January 1, 1988 through November 2009 to receive their retirement accumulations in the form of an annuity.  SAC ¶ 56.

### A.   The Board Has The Responsibility For Managing Plan Investments And ELCA Has Only Settlor Functions.

The Plan is a defined contribution retirement plan under Internal Revenue Code § 403(b)(9), controlled and administered entirely by the Board.  Declaration of Nicole A. Diller in Support of Defendants' Motion to Dismiss ("Diller Decl."), Ex. A (2003 Plan) §§ 1.03, 12.01.[3]  As plaintiffs allege, the Plan constitutes a "church plan" (SAC ¶¶ 17, 31), which makes it exempt from the Employee Retirement Income Security Act of 1974, as amended (ERISA), absent an election to the contrary.  29 U.S.C. § 1103(b) (ERISA does not cover plans maintained by an organization controlled by or associated with a

---

[2] While the complaint alleges that plaintiffs "elected" to receive their retirement benefits in the form of an annuity, the Plan mandated the annuitization of benefits until 2000. SAC ¶ 16.  Thus, plaintiffs Johnson and Haimerl, who retired before 2000, did not "elect" to receive their benefits as an annuity.

[3] In connection with its review of defendants' motion, the Court may consider any documents embraced by the complaint and matters of public record without converting the motion into an evidentiary one.  *See Noble Sys. Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 983 (8th Cir. 2008); *Bd. of Public Works, City of Blue Earth, Minn. v. Wis. Power & Light Co.*, 613 F. Supp. 2d 1122, 1126 (D. Minn. 2008).  The complaint's reference to each document submitted with this motion, or the document's public availability, is identified in the Diller declaration to which the materials are attached.

church, convention, or association of churches). Accordingly, ERISA's provisions and portions of the Internal Revenue Code do not apply to the Plan. *See, e.g.*, 28 U.S.C. §§ 401(a) and 411(e)(2)(B) (exempting church plans from certain qualification requirements).

Plaintiffs assert that both ELCA and the Board are responsible for the Plan. SAC ¶ 53. A review of the complaint's allegations and the referenced documents, however, shows that to the extent ELCA maintains any duties relating to the Plan, the responsibilities are purely those of a settlor or participating employer, not fiduciary responsibilities. *See, e.g.,* SAC ¶ 53(d) and (f) (ELCA as settlor); SAC ¶ 53(c), (e), (g), (h), (i), (j) and (k) (ELCA's establishment of the Board); SAC ¶ 53(l) (ELCA's settlor function of setting of benefit levels); SAC ¶ 31 (ELCA's restatement of the Plan); SAC ¶ 53(n) and (o) (ELCA's setting of Board employees' salaries). With respect to the Board's governance, the role of ELCA is purely advisory. SAC ¶53(m) (advisory role of ELCA representatives to Board).[4]

In contrast, the Board serves as the Plan's fiduciary, in charge of administering and managing the Plan. SAC ¶ 53(b) (Board's administration of the Plan); SAC ¶ 53(q) (Board's management of Plan assets). The Plan documents confirm the Board's discretionary authority to manage the Plan and its assets. *See, e.g.,* Diller Decl., Ex. A

---

[4] While the complaint alleges that ELCA Churchwide Assembly elects the Board's trustees, which could arguably be construed as akin to the function of an appointing fiduciary, there are no plausible allegations in the complaint that ELCA's Churchwide Assembly breached any alleged appointment duty. Thus, even if the election of the Board's trustees were a fiduciary act, plaintiffs have failed to allege any breach of it.

(2003 Plan) at § 12.01 (Board shall control and manage Plan); *id.*, Ex. E (2005 SPD) at

36 (Board's control over the operation and administration of the Plan); *id.*, Ex. A (2003

Plan) at § 8.01 (providing Board the sole discretion to select the Plan's investment

funds); *id.*, Ex. A (2003 Plan) at § 12.07 (providing Board authority to administer funds

in accordance with their objectives and policies).  ELCA's Constitution, Bylaws and

Continuing Resolutions ("ELCA Constitution") provides that the Board, not ELCA, bears

responsibility for the Plan's investment and administration.  Diller Decl., Ex. L (ELCA

Constitution) at 17.61.A05.

   **B.**   **The Plan Is A Defined Contribution Plan With Assets (Including Those Held In The Participating Annuity Fund) Subject To Market Performance.**

   Unlike a "defined benefit plan," a "defined contribution plan" promises the

participant the value of an individual account at retirement, which is largely a function of

the investment performance of those contributions.  *LaRue v. DeWolff, Boberg &*

*Associates Inc.,* 552 U.S. 248, 249, n. 1 (2008).  The SPDs informed participants of this

attribute, advising that as a defined contribution plan, "[f]uture benefits are based on the

member's account balance."[5]  Diller Decl., Ex. D (1997 SPD) at 21; *id.* Ex. E (2005 SPD)

at 39.

---

[5] The SPDs explicitly advise participants that the SPD provides a summary of the Plan, and that the full terms of the Plan are set forth in a formal plan document.  *See, e.g.,* Diller Decl., Ex. B (2001 SPD) at 1; *see also id.,* Ex. C (1995 SPD) at 1.  To the extent an SPD is found inconsistent with the Plan document, the formal document governs.  *Id.*

When participants retire and annuitize their benefits,[6] their account balance is transferred to the Participating Annuity Fund.  Diller Decl., Ex. A (2003 Plan) § 2.25. The Participating Annuity Fund and the annuities provided under it are identified as "participating" because annuitants participate in the Fund's gains and losses over time, making annuity payments subject to fluctuation based on investment returns.  *Id.* §§ 10.03 and 10.04 (annuity payments are based on assumed rates of return and mortality rates, which the Board can adjust annually "based on such factors as it deems to be appropriate").

As alleged in the complaint, from "1988 through 1996, retired Sponsored Members' monthly pension payments were paid out of the specific accounts in which each Sponsored Member invested."  SAC at ¶ 20.  Thus, participants who invested in a stock fund had their participating annuities paid from that fund, while the annuities of those invested in bonds were paid from the bond fund.  *Id.*  The SPDs disclosed that participants' monthly annuity benefits depended on several factors, including the "investment return on the funds selected by the Member…."  Diller Decl., Ex. C (1995 SPD) at 19.  Although the Plan was amended effective January 1, 1997 to require payment of the participating annuities from a balanced fund called the Pension Reserve, some participants who retired beforehand elected to have their annuities paid from other funds in which they chose to invest.  SAC ¶ 22; Diller Decl., Ex. K (1997 Plan) § 9.03,

---

[6] See note 2 as to the mandatory nature of annuitization prior to 2000, when the Plan design was changed to permit other forms of distribution.

10.02.  This structure was eliminated in 2006, when the Board merged the stock annuity

fund and bond annuity fund into the balanced fund.  Diller Decl., Ex. M (2006 SPD) at

14.  While this action harmonized all participants' returns, annuities remained

participating annuities.  *Id.*

The "permanent increases" discussed in the Plan documents relate to the increase

of the base amount used to calculate the monthly annuity payment.  These increases

resulted from a rising market.  Unlike a one-time dividend payment, these periodic

increases to the participating annuities permanently augmented monthly annuity

payments to participants.  *E.g.,* SAC ¶¶ 20, 21, 23, 29, 30, 37, 40-42.  That increase,

however, does not alter the underlying nature of the participating annuity.  Rather than

guaranteeing a dollar amount, the increase enlarges annuity entitlement.  *See* Diller Decl.,

Ex. D (1997 SPD) at 15 ("The increase – if any – will apply to all *pensions payable* to the

member, the contingent annuitant, and beneficiaries") (emphasis added); *id.,* Ex. C (1995

SPD) at 19 ("If such an amount [an increase] is declared, it will be used to increase the

*pension* throughout the Member's remaining lifetime") (emphasis added).

To illustrate:  If a participant received a five percent permanent adjustment to his

base annuity to increase an initial monthly annuity payment of $100 to $105, the

participant immediately receives the advantage of the additional five dollars.  Going

forward, the participant's increased annuity interest can still rise or fall based on market

performance, much like increased shares in a mutual fund would.  Thus, the Board's

implementation of a nine percent reduction to annuity payments in 2009 applied to the

increased base annuity - in this example, reducing the $105 annuity interest to $95.55, not

the original $100 annuity to $91.  This is similar to what happens when a mutual fund reinvests earnings for the investor, buying here five more shares to increase the investor's initial holding of 100 shares to 105.  As the mutual fund performance fluctuates, the value of the 105 shares will rise and fall but the investor nonetheless retains 105 shares.

**C.**  **The Plan And Related Documents Disclose That Benefits Are Subject To Market Performance.**

Throughout the putative class period, the SPDs informed participants that the market fluctuates and at time loses value.  *See, e.g.,* Diller Decl., Ex. B (2001 SPD) at 5 ("Because market value reflects the ups and downs (variability) in the investment market, account values will also vary up or down based on the actual investment performance of your fund(s) in which your account(s) is invested"); *id.* Ex. F (2002 SPD) at 11 ("Fund values may decline"); *id.* Ex. M (2006 SPD) at 8 (investment earnings can take the form of a "gain or loss"); *id.,* Ex. H (2008 SPD) at 9 ("*As year-to-year market returns fluctuate*, the Board of Pensions uses a unique tool – the interest-crediting rate – *to stabilize your annuity income*, with the *goal* of increasing your monthly annuity payments") (emphasis added); *id.,* Ex. C (1995 SPD) at 19 (disclosing that participants' monthly annuity amount depended on several factors, including the "investment return on the funds selected by the Member…").  Annual reports mailed to each member advised "[a]ll funds, including ELCA Annuity Fund, are subject to risk."  Diller Decl., Ex. N (2008 Annual Report) at 1.

In discussing investment in the Participating Annuity Bridge Fund[7] as an initial step in the annuitization of benefits, the SPD stated that the investment was designed to "*reduce* the possibility of short-term loss" - nothing promised such risk was *eliminated*. Diller Decl., Ex. B (2001 SPD) at 13 (emphasis added).  The SPD further informs that the Board determines the returns of the Participating Annuity Fund, including the Bridge Fund, according to a smoothing formula, with rates set by the Board to take into account both the actual and the long-term expected returns.[8]  Diller Decl., Ex. G (2004 SPD) at 12.

D.      **Beginning In 2007, The Nation Confronted Catastrophic Declines In The Market And Global Economy.**

By omitting any reference to the catastrophic financial market declines beginning in 2007, the complaint pretends that the Board breached a contract and/or exercised its fiduciary duties in a vacuum.  As the Court may judicially notice,[9] a financial crisis

---

[7] The Plan limits investment in the Bridge Fund to participants who have reached certain age and service requirements.  Diller Decl., Ex. B (2001 SPD) at 13.

[8] Specifically, the gains and losses to the Participating Annuity Fund are allocated to participants based on a formula that combines the long-term expected rate of return with the actual return for the last 12 months.  That rate is then compared to the assumed investment rate of 4.5% and the difference (positive or negative) is used to adjust annuity payments.  *See, e.g.,* Diller Decl., Ex. I (2009 letter to Plan members, 2009 Summary of Features); *id.* Ex. G (2004 SPD) at 12; *id.* Ex. H (2008 SPD) at 8.  This formula reduces volatility and permits flat or increased annuity payments when the market takes an occasional dip.  Diller Decl., Ex. I (2009 letter to Plan members & 2009 Summary of Features).

[9] The Court may take judicial notice of the national economic condition for purposes of this motion.  *See Third Nat'l Bank v. Impac, Ltd.*, 432 U.S. 312, 317 (1977) ("We may take judicial notice of the historical fact that 1873 was the year of a financial panic"); *In re HomeBanc Corp. Sec. Litig.*, 706 F. Supp. 2d 1336, 1341 n.1 (N.D. Ga. 2010)

erupted around the world in late 2007.  Spurred by delinquencies in so-called subprime

mortgages, which backed complex securities, the scope, severity, and sheer speed of this

crisis blind-sided the United States government, investors, and financial institutions.[10]

As the crisis deepened, financial markets worldwide declined rapidly and financial

institutions suffered significant losses.  The Dow Jones Industrial Average plummeted

from a high mark of 14,279 in October 2007 to a low of 6,440 in March 2009, losing

more than half its value.[11]  Automakers, large finance houses, and community banks

declared bankruptcy, though the federal government aided certain institutions deemed to

big to fail.[12]  In October 2008, the government passed a stimulus bailout package of $700

---

("tak[ing] judicial notice of the existence of the financial crisis"); *In re Huntington
Bancshares Inc. ERISA Litig.*, 620 F. Supp. 2d 842, 852 (S.D. Ohio 2009) (taking notice
of financial crisis resulting from the crash of the subprime markets).

[10] Ben S. Bernanke, Federal Reserve Chairman, Speech to International Monetary
Conference, Cape Town, South Africa (June 5, 2007), available at
http://www.federalreserve.gov/newsevents/speech/bernanke20070605a.htm ("[T]he
troubles in the subprime sector seem unlikely to seriously spill over to the broader
economy or the financial system"); Ben S. Bernanke, Federal Reserve Chairman, Speech
to the Federal Reserve Bank of Chicago's 43rd Annual Conference on Bank Structure
and Competition, Chicago, Illinois (May 17, 2007), available at
http://www.federalreserve.gov/newsevents/speech/bernanke20070517a.htm ("[G]iven the
fundamental factors in place that should support the demand for housing, we believe the
effect of the troubles in the subprime sector on the broader housing market will likely be
limited, and we do not expect significant spillovers from the subprime market to the rest
of the economy or to the financial system").

[11] *See* Floyd Norris, *Steep Market Drops Highlight Despair Over Rescue Efforts*, New
York Times (March 1, 2008), available at
http://www.nytimes.com/2009/03/03/business/worldbusiness/03markets.html (last visited
Feb. 25, 2011) ; Dow Jones Industrial Average During 2007-2009 Global Financial Crisis
Chart, available at http://www.epips.com/djia/2007-2009-financial-crisis.html.

[12] Andrew Ross Sorkin, *Lehman Files for Bankruptcy; Merrill Is Sold,* New York Times
(Sept. 14, 2008), available at

billion to assist embattled businesses and consumers through the crisis.[13]

Throughout this period, pension and other retirement accounts lost trillions of dollars.[14]  Minnesota's public pension funds, for instance, lost over $14 billion, with the Public Employees Retirement Association of Minnesota reporting that the funded status of its general plan dropped over 20 percent from 2007 to 2009 when calculated on the basis of the market value of its assets.[15]

---

http://www.nytimes.com/2008/09/15/business/15lehman.html (last visited Feb. 23, 2011); Louis Story, *Regulators Seize Mortgage Lender*, New York Times (July 14, 2008), available at http://www.nytimes.com/2008/07/12/business/12indymac.html?scp=9&sq=indymac%20 2008&st=Search (last visited Feb. 25, 2011); Deborah Solomon, *et al., U.S. to Buy Stakes in Nation's Largest Banks,* Wall Street Journal (Oct. 14, 2008), available at http://online.wsj.com/article/SB122390023840728367.html (last visited Feb. 23, 2011); Edmund L. Andrews, *et al., Fed's $85 Billion Loan Rescues Insurer*, New York Times (Sept. 16, 2008), available at http://www.nytimes.com/2008/09/17/business/17insure.html (last visited Feb. 23, 2011); *See* FDIC Failed Bank List available at http://www.fdic.gov/bank/individual/failed/banklist.html (last visited Mar. 2, 2011).

[13] *See* David M. Herszenhorn, *Bush Signs Bailout After House Votes Yes*, New York Times (Oct. 3, 2008), available at http://www.nytimes.com/2008/10/03/business/worldbusiness/03iht-04bailout.16682839.html (last visited Feb. 23, 2011).

[14] *Pension Plans Lose Trillions*, ABC News (Oct. 7, 2008), available at http://abcnews.go.com/Business/Economy/story?id=5976063&page=1.

[15] *See* Pat Doyle, *Tough Times May Force Changes in Minnesota Pension Funds*, Minneapolis-St. Paul Star Tribune (Dec. 10, 2008) , available at http://www.startribune.com/local/35840394.html (last visited Feb. 23, 2011); Public Employees Retirement Association of Minnesota, *Pension Myth vs. Pension Fact*, available at http://www.mnpera.org/index.asp?Type=B_BASIC&SEC=%7BA4C377CF-1748-4FA4-906F-0F6EE1698EA3%7D (last visited March 15, 2011).  As noted by PERA, the decrease to funding status is less substantial if an actuarial smoothing formula is applied. *Id.*

**E.**     **The Board Responded To The Economic Crisis By Decreasing Benefits In Order To Preserve The Viability Of The Fund.**

The Plan and the Participating Annuity Fund confronted the same economic realities, with significant losses causing severe underfunding that, if not remedied, could jeopardize the Fund's ability to continue providing annuity benefits throughout members' lifetimes.  Diller Decl., Ex. I (2009 letter to Plan members, 2009 FAQ).  The Board promptly advised Plan participants that the deepening market crisis was likely to affect monthly annuity payments from the Participating Annuity Fund.  SAC ¶¶ 46, 48, 49.  As the Board's President explained, the "historic and unexpected downturn in the investment markets . . . created a significant gap between the net assets in the [Participating Annuity Fund] and the projected lifetime benefit obligations to members."  Diller Decl., Ex. I (2009 letter to Plan members).

To protect the financial integrity of the Participating Annuity Fund, the Board decided in September 2009 to reduce annuity payments to ensure that Plan members would not outlive their retirement savings.  Diller Decl., Ex. I (2009 letter to Plan members).  The Board implemented the recovery program on January 1, 2010, reducing monthly payments from the Participating Annuity Fund by nine percent, with future annual reductions to be implemented if needed to restore the health of the Fund.  Diller Decl., Ex. I (2009 letter to Plan members & 2009 FAQ).

**III.   STANDARD OF REVIEW**

Federal Rule of Civil Procedure 12(b)(6) requires dismissal of a complaint that "fails[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  A

court may dismiss a complaint under Rule 12(b)(6) if a plaintiff's claim lacks a cognizable legal theory, or if the pleading contains insufficient facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Warren E. Johnson Companies v. Unified Brand, Inc.*, 735 F. Supp. 2d 1099, 1103-04 (D. Minn. 2010). While a court must assume the truth of a plaintiff's properly pled material factual allegations, it need not accept as true allegations that contradict other statements in the pleadings. *Bohan v. Honeywell, Int'l*, 2002 WL 31767786, at *1 (D. Minn. Dec. 9, 2002) ("If a document attached to the complaint contradicts the complaint's allegations, the document controls and the court need not accept as true the inconsistent allegations in the complaint").

## IV.   ARGUMENT

### A.   ELCA Should Be Dismissed From This Lawsuit Because There Is No Plausible Basis For Contending That ELCA Made The Challenged Fiduciary Decisions.

Plaintiffs contend ELCA is liable for annuity losses, either directly or vicariously via an alter ego theory.  Neither theory states a claim.

#### 1.   No allegations support a plausible claim that ELCA made the challenged fiduciary decisions.

The complaint does not allege that ELCA had any role in setting or altering the participating annuity payments.  To the extent the complaint contains allegations specific to ELCA, they relate only to alleged non-fiduciary, settlor acts.  SAC ¶ 13 (ELCA has offered the Plan since 1988); ¶ 31 (ELCA restated the Plan on January 1, 2003); SAC

¶ 53 (alleging establishment of Plan and creation of Board to manage it).  All other charging allegations are against "defendants" indiscriminately or the Board specifically. Notably, the complaint contains no allegations that ELCA had any role in the 2009 decision to reduce annuity payments.

ELCA's polity and organization create clear differentiation between ELCA and the Board.  ELCA's Constitution confirms that ELCA's role with respect to the Plan is limited to settlor functions.  The Constitution specifically limits the role of ELCA and its Church Council to approval of Plan governing documents and amendments.  *See* Diller Decl., Ex. L (ELCA Constitution) at 17.61.01 and 17.61.02.  All other duties regarding the Plan are assigned to the Board, which has the authority over the operation and management of the Plan.  *Id.*, Ex. L at 17.61 and 17.61.A05; s*ee also, id.*, Ex. L at 17.61.A05(a) (authorizing the Board, not ELCA, to "manage and operate" the Plan).  The Plan documents explicitly set forth the Board's roles, and give the Board full discretionary authority to "control and manage the operation and administration of the Retirement Plan and make all decisions and determinations incident thereto."  *See, e.g., id.,* Ex. A (2003 Plan) §§ 12.01, 12.12, 12.13.

In order to state an action for breach of trust, plaintiffs must allege that the defendant, as trustee, breached a duty owed to the beneficiaries of the trust.  Minn. Stat. § 501B.151 subd. 1(a) (imposing fiduciary duty of prudence upon trustees in connection with management and investment of trust assets); Restatement (Second) of Trusts § 201 (1959) (same).  ELCA is not a trustee because it does not invest or manage trust assets, and the Plan documents establish that the Board alone undertakes those functions.  Minn.

Stat. § 501B.81 (enumerating trustee powers, including investing and managing trust

assets); *see also* II.A., *supra* (ELCA is not conferred with any of the enumerated powers).

Further, the Supreme Court has repeatedly found that laws imposing duties upon

fiduciaries relating to the management or investment of trust assets are not implicated by

the amendment of an employee benefit plan, which is akin to a settlor's amendment of a

trust. *Lockheed Corp. v. Spink*, 517 U.S. 882, 891 (1996) (holding that when employers

adopt, modify, or terminate pension plans, "they do not act as fiduciaries but are

analogous to settlors of a trust") (citation omitted); *see also Hughes Aircraft Co. v.

Jacobson*, 525 U.S. 432, 444 (1999); *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S.

73, 78 (1995); *Schultz v. Windstream Commc'ns, Inc.*, 600 F.3d 948, 951-52 (8th Cir.

2010).  Thus, the only allegations specific to ELCA fail to give rise to any claim.

Plaintiffs' failure to distinguish between the two corporate defendants does not

circumvent the problem.  Where there are multiple defendants, a plaintiff may not simply

group them together for purposes of a complaint's charging allegations, but rather must

allege a specific basis for liability against each defendant individually.  *See, e.g.*, *Stoe v.

D.W. Jones Mgmt., Inc.*, No. 09-2672, 2010 WL 502780, at *2 (D. Minn. Feb. 5, 2010)

(to satisfy elemental pleading requirements, a complaint "must provide a clear and

concise explanation of the factual and legal grounds on which the claims against each

individual Defendant are based"); *United States v. Bonanno Organized Crime Family*,

683 F. Supp. 1411, 1429 (S.D.N.Y. 1988) ("a complaint must at the minimum reveal the

basis upon which relief is sought and connect the allegedly wrongful acts with the

defendants who are averred to have committed them"); *Rhodes v. Houston*, 202 F. Supp.

624, 629 (D. Neb. 1962), *aff'd per curiam* 309 F.2d 959 (8th Cir. 1962) (dismissing claims against certain defendants about whom plaintiff failed to articulate specific allegations); 5 Charles A. Wright *et al*., Fed. Practice & Proc. § 1248 (3d ed. 2010) ("in order to state a claim for relief, actions brought against multiple defendants must clearly specify the claims with which each individual defendant is charged").  The nonspecified conduct of "defendants" generally does not provide a concise explanation of the factual basis for the claims against ELCA sufficient to meet minimum pleading standards.  *Id.*

With no factual basis for their claims against ELCA, plaintiffs have failed to allege sufficient facts to "state a claim to relief that is plausible on its face." *Iqbal*, 129 S. Ct. at 1949-50.  A claim has facial plausibility only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1939.  The Court must disregard plaintiffs' conclusory statements regarding ELCA's liability because they are unsupported by specific facts in the complaint; such statements are not entitled to be assumed true for purposes of a Rule 12 motion. *Iqbal*, 129 S. Ct. at 1949 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  Where, as here, plaintiffs fail to specifically allege that ELCA is responsible, or even had the authority, for the actions underlying the alleged breaches, the claims against ELCA are insufficient as a matter of law.

### 2.   Plaintiffs' alter ego theory against ELCA also fails.

Plaintiffs also have failed to allege facts sufficient to allow the case to proceed against ELCA as the alter ego of the Board.  While plaintiffs attempt to invoke this

Court's ruling in *Thorkelson v. Publishing House of the Evangelical Lutheran Church in America*, No. 10-1712, 2011 WL 291930 (D. Minn. Jan. 27, 2011), the purported facts alleged there in support of the alter ego theory of liability are not asserted here. Specifically, plaintiffs in *Thorkelson* asserted on information and belief that AFP, an alleged alter ego of ELCA, transferred an asset to ELCA for no value, purportedly leading to the underfunding of AFP's pension plan. 2011 WL 291930, at *10. Plaintiffs here do not allege improper transfer of assets between ELCA and the Board. Nor do they allege any other type of purported misuse or abuse of the corporate form or scheme among defendants to harm the pastors, rostered lay leaders, and lay employees that make up the Plan's participants. Without such allegations, the alter ego claim fails. Indeed, plaintiffs fail to allege facts to support any of the factors articulated in *Victoria Elevator Co. of Minneapolis v. Meriden Grain Co., Inc.*, 283 N.W.2d 509, 512 (Minn. 1979), as determinative of an alter ego relationship.[16] As discussed above, the complaint and referenced documents demonstrate that the only role of ELCA is that of a settlor. This provides no basis for any claim against ELCA, alter ego or otherwise, and the Court

---

[16] *Victoria Elevator* requires use of a two-prong test when determining whether one corporation can be held liable for another's alleged wrongdoing. The first prong requires the presence of a *number of* the following factors: (1) insufficient capitalization for purposes of corporate undertaking; (2) failure to observe corporate formalities; (3) nonpayment of dividends; (4) insolvency of debtor corporation at time of transaction in question; (5) siphoning of funds by dominant shareholder; (6) nonfunctioning of other officers and directors; (7) absence of corporate records; and (8) existence of corporation as merely a façade for individual dealings. The second prong requires an "element of injustice or fundamental unfairness." Plaintiffs have failed to allege facts under either prong.

should dismiss plaintiffs' claims against ELCA.

**B.      The Board Should Be Dismissed From This Lawsuit Because It Fulfilled Its Fiduciary Obligation To Preserve The Participating Annuity Fund.**

Plaintiffs' claims for breach of contract and breach of fiduciary duty are premised on the contention that the Board's decision to reduce annuity payments (a) reneged on a promise of never-decreasing lifetime annuity payments and/or (b) took away prior permanent increases to base annuity amounts. Yet plaintiffs do not allege that the Board has stopped paying the annuities, and the complaint and documents embraced in it show that the reduction of monthly payments was made to ensure, in a declining market, that the annuity payments continued for participants' lifetimes. Nor did the alleged actions of the Board negate prior permanent increases to participants' benefit entitlement. The total entitlement, including the increases, simply participated in the Fund's market losses, as the participating annuity was designed to do. Finally, because the Board's actions were in the best interests of the participants, plaintiffs cannot articulate any damages.

**1.      Both the Plan documents and the law required the Board to administer the Participating Annuity Fund in the participants' long-term interests.**

As the SPDs informed participants, the Board administers the Plan in accordance with the "prudent investor" rule. Under this rule, the Board invests and manages the Plan's funds "as a prudent investor would, in light of the *purposes,* terms, distribution requirements and other circumstances of the trust." *See, e.g.*, Diller Decl., Ex. G (2004 SPD) at 38 (emphasis added) and *id.,* Ex. H (2008 SPD) at 31 (emphasis added), both quoting Restatement of the Law of Trusts, Third, section 227. Minnesota law has

codified and expanded upon this rule in the Minnesota Prudent Investor Act.  Minn. Stat.

§ 501B.151; *Norwest Bank v. Beckler*, 663 N.W.2d 571, 580 (Minn. Ct. App. 2003).  In

addition to requiring the Board to administer the Participating Annuity Fund according to

its purposes, the Minnesota Prudent Investor Act provides that the Board should consider

general economic conditions and the needs for regularity of income and

preservation of capital in administering the Fund.  Minn. Stat. § 501B.151, subd. 2(c).

To facilitate the Board's prudent Plan management, the governing documents

afford the Board broad discretion to take appropriate actions.  *See* Diller Decl., Ex. J

(1995 Plan) at § 8:11 (providing for annuity payments to be "subject to any rules,

regulations, and procedures which ELCA Board of Pensions, in its sole discretion,

considers necessary"); *id.* at §§ 6.08(c)-6.11(c) (affording Board "sole discretion" to

adjust the Plan's Participating Annuity Funds' values downward or upward to reflect

gains and losses); *id.*, Ex. A (2003 Plan) at § 8.06 (Board shall set regulations governing

distributions from participants' accounts); *id.* at § 9.09 (conferring Board with the

authority to regulate payments out of the Participating Annuity Fund); *id.* at § 12.01

(providing Board with authority to control and manage the Plan, including "all decisions

and determinations incident thereto"); *id.* at § 12.07 (providing Board authority to

administer investment funds in accordance with their objectives and policies); *id.*, Ex. E

(2005 SPD) at 36 (setting forth the Board's control over the operation and administration

of the Plan).[17]

Here, the Board reduced annuity payments in response to an economic crisis of an almost unprecedented magnitude that jeopardized the very viability of the Participating Annuity Fund.  As the Board explained to the Plan members, the reduction was required to meet the Board's "priority goal" of "providing annuity payments to members during their lifetimes."  Diller Decl., Ex. I (2009 letter to Plan members).  The Board has no authority to pay annuity payments from any source other than the Participating Annuity Fund.  Diller Decl., Ex. A (2003 Plan) § 2.25 (defining the "Participating Annuity Fund" as the fund from which annuitized retirement benefits shall be made); *id.*, Ex. A (2003 Plan) § 12.09 ("All benefits to which a person becomes entitled hereunder shall be provided only out of the appropriate Fund(s) and only to the extent that such Fund(s) is/are adequate therefor."); *id.*, Ex. E (2005 SPD) at 34  ("All benefits to which you are entitled under this plan will be provided only out of the appropriate investment fund(s), and only to the extent that such investment fund(s) is adequate").  Accordingly, because the annuity has always been a participating annuity and the Plan can make annuity payments only from the Participating Annuity Fund, the restorative program was fully appropriate under the terms of the Plan.

The Board's determination that the underfunded status of the Participating Annuity Fund required corrective action to support lifetime annuities also comports with

---

[17] Furthermore, the Plan limits the Board's liability in managing the Plan.  *See* Diller Decl., Ex. A (2003 Plan) § 12.10 (providing that the Board shall not be liable for actions taken in good faith).

settled fiduciary principles.  Faced with the worst financial crisis since the Great

Depression and annuity payments made unsustainable by the market collapse, the Board

acted consistently with its duties under Minnesota law by managing the Fund to

accomplish its purpose of providing lifetime payments.  Minn. Stat. § 501B.151; *Beckler*,

663 N.W.2d at 580-81 (trustee may not exercise its discretion in a manner that defeats the

purposes of the trust and a court will not interfere with decisions made in good faith,

from proper motives, and within the bounds of reasonable judgment) (citing *United*

*States v. O'Shaughnessy*, 517 N.W.2d 574, 577 (Minn. 1994)); *In re Trusteeship under*

*Agreement with Mayo*, 105 N.W.2d 900, 906 (Minn. 1960) (finding trust should be

managed in manner to effectuate its purpose); SAC ¶¶ 2, 23, 25, 33, 36, 38-40

(discussing lifetime attribute of annuity);  Diller Decl., Ex. G (2004 SPD) at 19 (annuity

payment designed to provide plan participants and beneficiaries "with a monthly income

for life – protecting [them] from outliving [their] savings").

　　　To continue payments at an unreduced level as the four named plaintiffs

demand, would have violated the Board's duty to administer the Participating

Annuity Fund impartially and for the benefit of all participants.  Restatement

(Third) of Trusts § 79 (2007) (setting forth duty of impartiality where there are

two or more beneficiaries to a trust).  This duty of impartiality required the Board

to safeguard the interests of all members of the Participating Annuity Fund, not to

manage the Fund as desired by certain plaintiff retirees.  *Beckler*, 663 N.W.2d at

581 (trustee has a duty to administer the trust impartially for all beneficiaries); *In*

*re Great N. Iron Ore Properties*, 263 N.W.2d 610, 613 (Minn. 1978) (trustees

have a "legal duty of impartiality between trust reversioner and income

beneficiaries, but have no duty to convert assets unless required to serve both

reversion and income interests"); *Nw. Nat'l Bank of Minneapolis v. Balch*, 31

N.W.2d 20, 32 (Minn. 1948) (trustees have duty to treat income beneficiaries and

remaindermen equally).[18]

In sum, because the Board's action effected the purpose of the Plan and the

Participating Annuity Fund, plaintiffs' claims for breach of contract and breach of

fiduciary duty should be dismissed.[19]

### 2. Plaintiffs fail to articulate damages because the Board acted in the best interests of the participants

If the Board had not reduced payments when it did, then plaintiffs' (and all the

participants') annuity income eventually would have been severely reduced or altogether

---

[18] *See also Varity Corp. v. Howe*, 516 U.S. 489, 514 (1996) ("The common law of trusts recognizes the need to preserve assets to satisfy future, as well as present, claims and requires a trustee to take impartial account of the interests of all beneficiaries") (citing Rest. 2d of Trusts §§ 183, 232); *Sarlin v. Sarlin*, 430 S.E.2d 530 (Ct. App. 1993) (trustee owes duty to exercise fairness to both the income and remainder beneficiaries).

[19] In any event, as economic realities make continued, unreduced benefits impossible, trust law exempts the Board from any arguable duty to provide such payments. *See* Restatement (Second) of Trusts § 165 (1959), (1) (trustee is not under a duty to comply with a term of the trust requiring him to do an act reasonably appearing to be impossible); *see also Jacobs v. Bean,* 108 A.2d 559, 560 (N.H. 1954) (same); *Buse v. Vanguard Grp. of Inv. Companies v. Skinner,* 1996 WL 744899, at *3 n.5 (E.D. Pa. Dec. 23, 1996) (same); *Crocker-Citizens Nat'l Bank v. Younger,* 4 Cal.3d 202, 211 (Cal. 1971) (same). Accordingly, the Minnesota Supreme Court has held that trustees may deviate from a trust's terms when "the accomplishment of the purposes of the trust would otherwise be defeated or substantially impaired." *In re Trusteeship under Agreement with Mayo*, 105 N.W.2d 900, 904 (Minn. 1960) (citing Restatement (Second) of Trusts § 167). Further, equity permits deviation in the administration of a trust "in order to carry out its dominant purpose particularly when changing circumstances would otherwise defeat it." *Jacobs*, 108 A.2d at 561; *Balch*, 331 N.W.2d at 34.

eliminated. Because continued, unreduced payments would have harmed plaintiffs' long-term interests, the complaint fails to articulate cognizable losses, and plaintiffs' claims should be dismissed. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (plaintiff has no claim where defendant's conduct caused no economic loss); *Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 549-50 (8th Cir. 2008) (complaint must allege causal connection between defendant's conduct and alleged loss) (citing *Dura Pharm.*, 544 U.S. at 347)); *Aguilera v. Pirelli Armstrong Tire Corp.*, 223 F.3d 1010, 1015 (9th Cir. 2000) ("breach of contract claim requires a showing of appreciable and actual damage"); *Burger King Corp. v. Mason*, 710 F.2d 1480, 1490 (11th Cir. 1983) ("it is elementary that the mere breach of an agreement which causes no loss ... will not sustain a suit for damages").

### C.  A Request For Injunctive Relief Does Not State A Cause Of Action.

Plaintiffs' third cause of action is a request for injunctive relief. SAC ¶¶ 90-96. This "claim" must be dismissed because an injunction is not a cause of action, but a remedy. *See Minn. Indus. Ventures, LLC v. City of Roseville*, No. 052488-RHK-JSM, 2006 WL 763208, at *5 n.4 (D. Minn. Mar. 24, 2006) ("an injunction is a remedy, not a cause of action") (citing *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 211 n.1 (2002)). As such, plaintiffs' "claim" for injunctive relief should be dismissed.

## V.  CONCLUSION

For the reasons stated above, defendants respectfully request that the Court dismiss the Second Amended Complaint.

Dated:  March 21, 2011            s/ Charles C. Jackson
                                  Charles C. Jackson (admitted pro hac vice)
                                  (Illinois State Bar No. 01309374)
                                  Nicole A. Diller (admitted pro hac vice)
                                  (California State Bar No. 154842)
                                  MORGAN, LEWIS & BOCKIUS LLP
                                  77 West Wacker Drive
                                  Chicago, IL 60601-5094
                                  (312) 324-1000
                                  (312) 324-1001 (fax)
                                  charles.jackson@morganlewis.com
                                  ndiller@morganlewis.com

                                  Attorneys for Defendants Board of Pensions of
                                  Evangelical Lutheran Church in America and
                                  Evangelical Lutheran Church in America


Dated:  March 21, 2011            s/ Thomas Fraser
                                  Thomas Fraser (State Bar No. 31641)
                                  Nicole M. Moen (State Bar No. 329435)
                                  FREDRIKSON & BYRON, PA
                                  200 South Sixth Street, Ste 4000
                                  Minneapolis, MN 55402-1425
                                  (612) 492-7000
                                  (612) 492-7077 (fax)
                                  tfraser@fredlaw.com
                                  nmoen@fredlaw.com

                                  Attorneys for Defendant Board of Pensions of
                                  Evangelical Lutheran Church in America

Dated:  March 21, 2011                    s/ Ruth S. Marcott_____
                                          Ruth S. Marcott (State Bar No. 176825)
                                          Brian T. Benkstein (State Bar No. 325545)
                                          FELHABER, LARSON, FENLON & VOGT, PA.
                                          220 South Sixth Street, Suite 2200
                                          Minneapolis, MN 55402
                                          (612) 373.8435
                                          (612) 338-0535 (fax)
                                          rmarcott@felhaber.com
                                          bbenkstein@felhaber.com

                                          Attorneys for Defendant Evangelical Lutheran Church
                                          in America

DB2/22323481.1