# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

PASTOR BENJAMIN A. JOHNSON,
et al., on behalf of themselves and all
others similarly situated,

        Plaintiffs,

v.

        **MEMORANDUM OF LAW & ORDER**
        Civil File No. 11-23 (MJD/LIB)

THE EVANGELICAL LUTHERAN
CHURCH IN AMERICA, and
BOARD OF PENSIONS OF THE
EVANGELICAL LUTHERAN CHURCH
IN AMERICA,

        Defendants.

Vincent J. Esades and Scott W. Carlson, Heins Mills & Olson, PLC, and Daniel R. Karon, Brian D. Penny, Paul J. Scarlato, and Laura K. Mummert, Goldman Scarlato & Karon, PC, Counsel for Plaintiffs.

Charles C. Jackson, Nicole A. Diller, and S. Bradley Perkins, Morgan Lewis & Bockius LLP, and Ruth S. Marcott and Brian T. Benkstein, Felhaber Larson Fenlon & Vogt, PA, Counsel for Defendant the Evangelical Lutheran Church in America.

Charles C. Jackson, Nicole A. Diller, and S. Bradley Perkins, Morgan Lewis & Bockius LLP, and Thomas S. Fraser and Nicole M. Moen, Fredrikson & Byron, PA, Counsel for Defendant Board of Pensions of the Evangelical Lutheran Church in America.

## I.      INTRODUCTION

This matter is before the Court on Defendants' Motion to Dismiss.  [Docket

No. 34]  The Court heard oral argument on May 13, 2011.  For the reasons that

follow, the Court denies the motion to dismiss as it applies to the Board and

grants the motion to dismiss as it applies to ELCA, but permits Plaintiffs the

opportunity to amend with regard to ELCA.

## II.     BACKGROUND

### A.      Factual Background

### 1.      Defendants and the Plan

Defendant the Evangelical Lutheran Church in America ("ELCA") is a

non-profit corporation organized under Minnesota law.  (Second Amended

Complaint ("SAC") ¶ 11.)  Defendant Board of Pensions of the Evangelical

Lutheran Church in America (the "Board") is a non-profit corporation organized

under Minnesota law.  (SAC ¶ 12.)  ELCA established the Board in 1988 to

provide and administer retirement, health and other benefits to individuals who

work for ELCA or other faith-based organizations associated with ELCA.  (Id.)

The Board is governed by a 17-member Board of Trustees that is elected from the

churchwide membership of ELCA.  (Id.)  ELCA and the Board are separately

2

incorporated, but Plaintiffs allege that ELCA is entwined with the Board and that the Board is an alter ego or instrumentality of ELCA.  (SAC ¶¶ 53-54.)

The Board manages the Evangelical Lutheran Church in America Retirement Plan ("Plan").  (SAC ¶ 13.)  The Plan is a defined contribution retirement plan under 26 U.S.C. § 403(b)(9), under which participating employers make defined contributions on behalf of participants.  (Id.)  The Plan provides that the Board is "responsible for all administrative decisions with regard to the form, commencement and amount of payments from this Retirement Plan." (Diller Decl., Ex. A., 2003 Plan § 1.03.)

The Plan is a "church plan."  (SAC ¶¶ 17, 31.)  Therefore, it is exempt from ERISA, absent an election to the contrary.  26 U.S.C. §§ 411(e)(2)(B), 414(e);  29 U.S.C. §§ 1002(33), 1003(b).

Under the Plan, defined contributions are made on behalf of participating members into their individual accounts.  (SAC ¶ 13.)  Plan participants have options for directing their Plan accumulations.  Before retirement, the accounts are considered "active," and Plan participants can direct their accumulations into funds invested in the equity or fixed income markets.  (SAC ¶ 18.)

Before 2001, all participants were required to annuitize their accumulations upon retirement. The accounts were then no longer considered "active." (SAC ¶¶ 16-19.) Starting in 2001, at retirement, participants had the choice of annuitizing their accumulations and receiving a monthly annuity for life, leaving their accounts "active," or a combination of the two. (SAC ¶¶ 16, 24-27.) Only the first choice is at issue in this lawsuit.

Between 1988 and 1996, participants were paid their monthly annuity out of three separate funds, depending on their elections – the balanced fund, bond fund, and stock fund. (SAC ¶ 20.) Between 1997 and 2003, annuity payments were paid from a single "Pension Reserve Fund" instead of the specific funds in which participants were invested. (SAC ¶¶ 22, 35.) Between 2003 and 2006, the single fund was known as the Participating Annuity Fund. (SAC ¶ 41.) In 2007, it was renamed the "ELCA Annuity Fund." (Id.) (The single fund, created in 1997, is referred to in this Order as the "Annuity Fund.")

## 2.    Plaintiffs

Plaintiffs are four retired participants in the ELCA Plan, all of whom served as pastors at one point. Plaintiff Benjamin A. Johnson retired in 1995 and began receiving monthly annuity payments. (SAC ¶ 7.) In 1995, when Johnson

retired, the Plan mandated the annuitization of benefits.  (Id. ¶ 16.)  His monthly

annuity payments were "permanently" increased each year until January 2010,

when his monthly annuity payments were reduced.  (Id. ¶ 7.)

Plaintiff Ronald A. Lundeen retired in 2002 and elected monthly annuity

payments, but deferred his payments until 2007.  (SAC ¶ 8.)  He began receiving

monthly annuity payments in 2007.  They were then "permanently" increased

each year until January 2010, when they were reduced. (Id.)

Plaintiff Larry D. Cartford retired in 2002 and elected the Plan's annuity

option.  (SAC ¶ 9.)  His monthly payments were "permanently" increased each

year until January 2010, when they were reduced.  (Id.)

Plaintiff Arthur F. Haimerl retired in February 2000.  (SAC ¶ 10.)  At that

time, he was required to annuitize his account.  His monthly payments

"permanently" increased each year until January 2010, when they were reduced.

(Id.)

Plaintiffs claim that their annuity payments were guaranteed for life and

that increases in these guaranteed lifetime annuity payments would be

permanent.  (SAC ¶ 1.)

### 3.    Allegations of Misconduct by Defendants

Plaintiffs assert that, under Minnesota law, Defendants were required to invest and manage the Annuity Fund as a prudent investor would.  (SAC ¶ 74 (citing the Minnesota Prudent Investor Act, Minn. Stat. § 501B.151 ("PIA")); see also Diller Decl., Ex. G, 2004 Summary Plan Description ("SPD") at 38 (stating that Board is bound by prudent investor rule and PIA); Diller Decl., Ex. H, 2008 SPD at 31 (same).)

Plaintiffs allege that Defendants breached their fiduciary duties to Plaintiffs by failing to prudently invest and manage the Annuity Fund and failing to preserve the trust corpus during the Class Period (January 1988-November 2009), which caused the Annuity Fund to become significantly underfunded and reduce Plaintiffs' monthly annuity payments.  (SAC ¶¶ 78-79.)

In December 2008, the Board sent a letter to Plaintiffs stating that annuity payments were subject to market risk and that they should expect their annuity payments to be decreased in 2010.  (SAC ¶ 43.)  In 2009, the Board issued the 2008 Annual Report, which added statements about potential market risk in the Annuity Fund.  (SAC ¶ 44.)  Such warnings were not included in prior Annual Reports.  (Id.)

In September 2009, Board CEO and President John Kapanke informed Plan participants that, due to the market downturn, the Annuity Fund was underfunded by 26% and that, effective January 1, 2010, their monthly annuity payments would decrease by 9% and would likely decrease by an additional 9% in both 2011 and 2012.  (SAC ¶¶ 3, 45.)  (See also Diller Decl., Ex. I, Sept. 2009 Letter to Plan Participants.)

**B.      Procedural History**

On December 3, 2010, Plaintiffs filed a Complaint in Hennepin County District Court against ELCA, the Board, and two Board executives who have since been dismissed from the lawsuit.  On January 4, 2011, Defendants removed the case to this Court based on the Class Action Fairness Act of 2005 ("CAFA").

On March 3, 2011, Plaintiffs filed their SAC.  [Docket No. 29]  The SAC alleges Count One: Breach of Contract under Minnesota Law; Count Two: Breach of Fiduciary Duty of Prudence under Minnesota Common and Statutory Law; and Count Three: Request for Injunctive Relief.  Plaintiffs seek to sue on behalf of a class of Plan participants who elected, from January 1, 1988 through November 2009, to receive their retirement payments in the form of an annuity.  (SAC ¶ 56.)

**III.     DISCUSSION**

### A.    Motion to Dismiss Standard

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may move the Court to dismiss a claim if, on the pleadings, a party has failed to state a claim upon which relief may be granted.  In reviewing a motion to dismiss, the Court takes all facts alleged in the complaint to be true.  <u>Zutz v. Nelson</u>, 601 F.3d 842, 848 (8th Cir. 2010).

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  Thus, although a complaint need not include detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.

<u>Id.</u> (citations omitted).

In deciding a motion to dismiss, the Court considers "the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint."  <u>PureChoice, Inc. v. Macke</u>, Civil No. 07-1290, 2007 WL 2023568, at *5 (D. Minn. July 10, 2007) (citing <u>Porous Media Corp. v. Pall Corp.</u>, 186 F.3d 1077, 1079 (8th Circ. 1999)).

### B.    Claims Against ELCA

Overall, Plaintiffs assert that ELCA is a proper defendant for Count One, Breach of Contract, because it is a party to the contract and for Count Two, Breach of Fiduciary Duty, because it is a de facto fiduciary.  Alternatively, Plaintiffs assert that ELCA is a proper defendant for both counts under alter ego liability.  (SAC ¶¶ 53-54.)

Based on the SAC, there is no allegation that ELCA had any role in the 2009 decision to reduce annuity payments; the Board made that decision. Because, as the complaint is currently pled, Plaintiffs fail to specifically allege that ELCA is responsible, or even had the authority, for the actions underlying the alleged breaches, the claims against ELCA must be dismissed.

### 1.   Whether ELCA Is a Fiduciary or Trustee

#### a)   Definition of Fiduciary or Trustee

In order to state a cause of action for breach of trust under the PIA, a plaintiff must allege that the defendant, as trustee, breached a duty owed to the beneficiaries of the trust.  Minn. Stat. § 501B.151, subd. 1(a).  Plaintiffs assert that ELCA is a de facto fiduciary under the Minnesota common law of trusts.  "A 'fiduciary' is [a] person who is required to act for the benefit of another person on all matters within the scope of their relationship.  The duty imposed on

fiduciaries is the highest standard of duty implied by law."  <u>Swenson v. Bender</u>,

764 N.W.2d 596, 601 (Minn. Ct. App. 2009) (citations omitted).  "A fiduciary

relationship is characterized by a 'fiduciary' who enjoys a superior position in

terms of knowledge and authority and in whom the other party places a high

level of trust and confidence."  <u>Carlson v. Sala Architects, Inc.</u>, 732 N.W.2d 324,

330 (Minn. Ct. App. 2007) (citations omitted).

 "The existence of a fiduciary relationship is generally a question of fact."

<u>Swenson</u>, 764 N.W.2d at 601 (citation omitted).  "Minnesota caselaw recognizes

two categories of fiduciary relationship: relationships of a fiduciary nature per

se, and relationships in which circumstances establish a de facto fiduciary

obligation."  <u>Id.</u> (citation omitted). "Per se fiduciary relationships include trustee-

beneficiary, attorney-client, business partnerships, director-corporation, officer-

corporation, and husband-wife."  <u>Id.</u> (citations omitted).  Plaintiffs claim that

ELCA is a de facto fiduciary for Plaintiffs.

**b)**  **Plan Language**

**i.**  **The Board's Plan Duties**

 The Board, not ELCA, is the Plan fiduciary, in charge of administering and

managing the Plan, as set forth in both the SAC and the Plan Documents.  (<u>See</u>

10

SAC ¶ 53(b) (alleging that Board "administers the ELCA's retirement, health, and related-benefit plans and manages the trusts for these benefit plans"); id. ¶ 53(q) (alleging that the Board "manages the assets of the ELCA, as requested").)  (See also, e.g., Diller Decl., Ex. A, 2003 Plan § 12.01 (providing that, unless expressly otherwise provided, the Board "shall control and manage the operation and administration of the Retirement Plan and make all decisions and determinations incident thereto"); id. § 8.01 ("The [Board] shall, in its sole discretion, select the Investment Funds in which the ELCA Retirement Trust shall invest pursuant to Member investment instructions . . . ."); Diller Decl., Ex. E, 2005 SPD at 36 ("The [Board] controls and manages the operation and administration of the Retirement Plan and makes all decisions and determinations pertaining to the plan.").)

ELCA's Constitutions, Bylaws and Continuing Resolutions ("ELCA Constitution") provide that the Board, not ELCA, bears responsibility for the Plan's investment and administration.  (See Diller Decl., Ex. L, ELCA Constitution § 17.61.A05 (setting forth Board's responsibilities, including to manage and operate the pension plan and provide pension benefits).)

### ii.    ELCA as the Settlor

The laws imposing duties upon fiduciaries relating to the management or investment of trust assets are not implicated when an entity amends an employee benefit plan, thereby acting as a settlor amending a trust.  See, e.g., Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 444 (1999) ("ERISA's fiduciary duty requirement simply is not implicated where [the employer], acting as the Plan's settlor, makes a decision regarding the form or structure of the Plan such as who is entitled to receive Plan benefits and in what amounts, or how such benefits are calculated.");  Schultz v. Windstream Commc'ns, Inc., 600 F.3d 948, 951 (8th Cir. 2010) ("[W]hen employers adopt, modify, or terminate plans that provide pension benefits, they do not act as fiduciaries, but are analogous to the settlors of a trust.") (citations omitted).

The SAC's allegations against Defendants demonstrate that the only duties ELCA maintains with regard to the Plan that are at issue in this case are those of a settlor or participating employer, not of a fiduciary.  (See, e.g., SAC ¶ 53(d), (f) (ELCA as settlor with the purpose of providing pensions to employees); id. ¶ 53(c), (e), (g)-(k) (ELCA's establishment of the Board); id. ¶ 53(l) (ELCA's settlor function of setting levels of benefits under the Plan); id. ¶ 31 (ELCA's amendment and restatement of the Plan).)  While the ELCA Churchwide

Assembly elects the Board's trustees, there is no allegation in the SAC that

ELCA's Churchwide Assembly breached any alleged appointment duty in

choosing those Board trustees.

The SAC does not allege that ELCA had any role in setting or altering the

monthly annuity payments.  The SAC's allegations specific to ELCA relate only

to non-fiduciary, settlor acts.  (See SAC ¶ 13 (alleging that ELCA has offered the

Plan since 1988); id. ¶ 31 (alleging that ELCA restated the Plan on January 1,

2003); id. ¶ 53 (alleging establishment of Plan and creation of Board to manage

it).

### c)   De Facto Fiduciary Claim

Plaintiffs have plausibly argued that ELCA is a fiduciary with respect to its

duty to elect Plan fiduciaries, and therefore, also has a limited duty to monitor.

See, e.g., In re Xcel Energy, Inc., Sec., Derivative & ERISA Litig., 312 F. Supp. 2d

1165, 1176 (D. Minn. 2004) ("A person with discretionary authority to appoint,

maintain and remove plan fiduciaries is himself deemed a fiduciary with respect

to the exercise of that authority.  Implicit in the fiduciary duties attaching to

persons empowered to appoint and remove plan fiduciaries is the duty to

monitor appointees.  The scope of the duty to monitor appointees is relatively

narrow.") (citations omitted).  The duty to monitor is limited and does not

include a duty "to review all business decisions of Plan administrators," because

"that standard would defeat the purpose of having trustees appointed to run a

benefits plan in the first place."  Howell v. Motorola, Inc., 633 F.3d 552, 573 (7th

Cir. 2011).

However, the SAC does not allege that ELCA violated the duty to monitor.

Therefore, the SAC fails to adequately allege that ELCA violated a fiduciary duty

owed to Plaintiffs.  See, e.g., Neil v. Zell, 677 F. Supp. 2d 1010, 1023-24 (N.D. Ill.

2009) (holding that plaintiffs' allegations "in the most general terms" that Board

of Directors breached their duty to monitor other fiduciaries did not satisfy

Twombly).

### d)  The Plan's Status as a Church Plan

The Court rejects Plaintiffs' assertion that the Plan's status as a church plan

somehow creates a cause of action against ELCA based on the Board's actions.

A church plan must be "established and maintained . . . by a church."  29

U.S.C. §§ 1002(33)(A).  A plan maintained by a third party, such as the Board, is

"established and maintained . . . by a church" if the third party "is controlled by

or associated with a church or a convention or association of churches."  Id. §

1002(33)(C)(i).  Church plan status is awarded not only to plans controlled by a church, but also to plans <u>associated</u> with a church.  See id. §1002(33)(C)(i).  An organization is "associated with" a church "if it shares common religious bonds and convictions with that church."  Id. § 1002(33)(C)(iv).  The Plan's status as a church plan does not require that ELCA exercise control over the Board or Plan, let alone control over the Board's actions at issue in this lawsuit, to the extent that ELCA is liable for the Board's actions.  Here, the SAC does not allege that ELCA controls the Board with regard to the decisions at issue in this litigation.

### 2.      Whether Plaintiffs Have Pled Alter Ego Liability

As an alternative means of holding ELCA liable, the SAC alleges that the Board is an alter ego of ELCA and that "injustice and fundamental unfairness would result if the ELCA is not held accountable" for the Board's misconduct. (SAC ¶ 53.)  Plaintiffs have failed to allege sufficient facts to state a claim for alter ego liability.

### a)      Standard for Alter Ego Liability

There is a "presumption of separateness" between a parent and subsidiary corporation.  Ass'n of Mill & Elevator Mutual Ins. Co. v. Barzen Int'l, Inc., 553 N.W.2d 446, 449 (Minn. Ct. App. 1996) (citation omitted).  However, "[p]iercing

the corporate veil is an equitable remedy that may be applied in order to avoid

an injustice." Equity Trust Co. Custodian ex rel. Eisenmenger IRA v. Cole, 766

N.W.2d 334, 339 (Minn. Ct. App. 2009) (citation omitted). "A court may pierce

the corporate veil to hold a party liable for the acts of a corporate entity if the

entity is used for a fraudulent purpose or the party is the alter ego of the entity.

When using the alter ego theory to pierce the corporate veil, courts look to the

reality and not form, with how the corporation operated and the individual

defendant's relationship to that operation." Id. (citations omitted).

"Under Minnesota law, piercing the corporate veil requires (1) analyzing

the reality of how the corporation functioned and the defendant's relationship to

that operation, and (2) finding injustice or fundamental unfairness." Minn.

Power v. Armco, Inc., 937 F.2d 1363, 1367 (8th Cir. 1991).

> The first prong focuses on the shareholder's relationship to the
> corporation. Factors that are significant to the assessment of this
> relationship include whether there is insufficient capitalization for
> purposes of corporate undertaking, a failure to observe corporate
> formalities, nonpayment of dividends, insolvency of debtor
> corporation at time of transaction in question, siphoning of funds by
> dominant shareholder, nonfunctioning of other officers and
> directors, absence of corporate records, and existence of the
> corporation as merely a facade for individual dealings. The second
> prong requires showing that piercing the corporate veil is necessary
> to avoid injustice or fundamental unfairness.

Barton v. Moore, 558 N.W.2d 746, 749 (Minn. 1997) (citations omitted).

### b)    First Prong

The SAC does not allege any improper transfer of assets between ELCA

and the Board.  Nor does it allege any other type of misuse of the corporate form

or plan to harm Plaintiffs.  Cf. Thorkelson v. Publishing House of Evangelical

Lutheran Church in Am., 764 F. Supp. 2d 1119, 1130-31 (D. Minn. 2011) (holding

that plaintiffs had asserted sufficient factual allegations to support piercing the

corporate veil between ELCA and Augsburg Fortress Publishers ("AFP") when

plaintiffs alleged that AFP transferred a valuable asset to ELCA, which led to the

underfunding of AFP's pension plan, and plaintiffs pled allegations of

"corporate siphoning").  The SAC alleges that the Board is undercapitalized, but

there is no allegation that ELCA played any role in that situation.  (SAC ¶ 53.)

Beyond the conclusory allegation of undercapitalization, there are no factual

allegations to support the first prong of piercing the corporate veil.

ELCA and the Board share a close relationship.  However, the ELCA

Constitution shows the separation of the corporate structures governing ELCA

and the Board.  For example, the Constitution provides that "[s]eparate

incorporation shall be maintained" for the Board.  (Diller Decl., Ex. L, ELCA

Constitution § 17.12.)  It enumerates the Board's responsibilities in operating and

managing benefit plans, which include autonomy and independence.  (<u>Id.</u> §

17.61.A05.)  The documents referenced in the SAC demonstrate that ELCA and

the Board are separate corporate entities, and the SAC provides no factual

allegation that these corporate formalities have been disregarded.

### c)      Second Prong

The SAC alleges: "The ELCA Board of Pensions is an alter ego or

instrumentality of the ELCA, and injustice and fundamental unfairness would

result if the ELCA is not held accountable for the liabilities resulting from

shortfalls in the ELCA Retirement Plan due to undercapitalization or the ELCA

Board of Pensions' lack of resources to cover its liabilities."  (SAC ¶ 53.)  This

barebones allegation that injustice or fundamental unfairness will result if ELCA

is not liable is insufficient.  Although the SAC generally alleges that the Plan was

underfunded, there is no allegation that ELCA played any role in that

underfunding or that the Plan was underfunded when ELCA created it.

Plaintiffs fail to allege facts to support their legal conclusion of injustice or

unfairness.  <u>See</u> <u>SICK, Inc. v. Motion Control Corp.</u>, No. Civ. 01-1496 (JRT/FLN),

2003 WL 21448864, at *9 (D. Minn. June 19, 2003) (dismissing alter ego claim

because plaintiff failed to "properly plead[] that 'injustice or fundamental unfairness' exists").  "[A]lthough corporations are related, there can be no piercing of the veil without a showing of improper conduct." <u>Barzen Int'l, Inc.</u>, 553 N.W.2d at 449 (citation omitted).

> **d)    Effect of Plaintiffs' Failure to Plead Facts to Support Alter Ego Liability**

Plaintiffs must allege facts to support their alter ego theory.  The federal pleading standard requires

> sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  Thus, although a complaint need not include detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.

<u>Zutz</u>, 601 F.3d at 848 (citations omitted).

The complaint must articulate the factual prerequisites to a claim to survive a motion to dismiss.  The Court has already held that the SAC fails to plead that ELCA is directly liable for the counts asserted.  Additionally, the SAC does not allege that ELCA had any role in creating the allegedly misleading Plan Documents.  Finally, as the SAC is currently pled, there is no plausible claim for alter ego liability.  Consequently, there is no basis for holding ELCA liable for

any of the counts pled against it.   See, e.g., Spagnola v. Chubb Corp., 264 F.R.D.

76, 86 (S.D.N.Y. 2010) (noting that "courts routinely consider, and grant, motions

to dismiss for failure adequately to allege facts sufficient to support the

imputation of liability on an alleged alter-ego").

The Court grants Defendants' motion to dismiss as to ELCA, but will

permit Plaintiffs 30 days from the date of this Order to file an amended SAC that

articulates a viable claim against ELCA.  If no amendment is filed within 30 days,

the dismissal of ELCA will be with prejudice.

### C.    Count One: Whether Plaintiffs State a Claim for Breach of Contract Against the Board

#### 1.    Elements of a Breach of Contract Claim

Under Minnesota law, a breach of contract claim has four elements: "1)

formation of a contract; (2) performance by plaintiff of any conditions precedent;

(3) a material breach of the contract by defendant; and (4) damages." Parkhill v.

Minn. Mutual Life Ins. Co., 174 F. Supp. 2d 951, 961 (D. Minn. 2000) (citations

omitted), aff'd 286 F.3d 1051 (8th Cir. 2002).

#### 2.    Existence of a Contract

Defendants do not dispute the existence of a contract between Defendants

and Plaintiffs formed by the "Plan Documents," which consist of the terms of the

Plan and the SPDs.  (SAC ¶¶ 13, 64.)  However, the parties dispute whether the

Plan Documents promised Plaintiffs a fixed monthly annuity amount.

### 3.   Whether the Plan Promised Plaintiffs a Fixed Monthly Annuity Amount

Plaintiffs allege that Defendants "promised that **Plaintiffs' annuity**

**payments were guaranteed for life** and also **that increases in these guaranteed**

**lifetime annuity payments would be permanent.**"  (SAC ¶ 1.)  They further

claim that the Plan Documents implied that the Annuity Fund would not be

subject to market risk.  They claim that these promises were made in the Plan

Documents sent to Plaintiffs each year during the Class Period.  (SAC ¶¶ 42, 50.)

Defendants point to a number of statements in the various versions of the

Plan and the SPD, which, they claim, warned Plaintiffs that market fluctuations

could affect their monthly annuity payments.  Plaintiffs assert that the market

risk disclosures cited by Defendants did not refer to the Annuity Fund, but to

other types of retirement investments.

The Court holds that Plaintiffs have adequately pled that the Plan

promised a fixed monthly annuity amount.  The Plan Documents repeatedly

assured participants that increases in the annuity payments were permanent.

(See, e.g., Diller Decl., Ex. C, 1995 SPD at 19 (stating "that there will be no

downward adjustment of the basic pension coming from a bond or balanced fund" and that all increases declared are guaranteed "to increase the pension throughout the Member's remaining lifetime"); Diller Decl., Ex. B, 2001 SPD at 20 (stating, with regard to monthly annuity payments, that "[a]ny increase is permanent and applies to all payments made to you, your joint annuitant and beneficiaries"); 2001 SPD at 14 (contrasting the risks of remaining actively invested with the security of annuitizing funds: "If you leave your retirement account 'active,' you do not have a guarantee of lifetime monthly pension payment, and the accumulations in your account are vulnerable to the fluctuation in the market.").)  Warnings regarding market fluctuations did not clearly apply to the Annuity Fund until 2009, when the 2008 Annual Report was issued.  (See Diller Decl., Ex. N, 2008 Annual Report at 1 ("All funds, including ELCA Annuity Fund, are subject to risk.").)

Defendants offer the explanation that, while the increase of the base amount used to calculate the monthly annuity payment was permanent, the dollar figure, itself, was not permanent.  In their arguments on this motion, Defendants provide an illustration of this theory, explaining that a participant's increased annuity interest can still rise or fall based on market performance, like

an increased share in a mutual fund would.  However, this explanation does not appear in the Plan Documents.  Based on the SAC and the Plan Documents provided to the Court, Plaintiffs' interpretation of the Plan is also reasonable.

The Court further concludes that, based on the record before the Court at this time, the fact that the certain Plan Documents labeled the Annuity Fund "participating" does not unambiguously signal that the monthly payment amounts may be decreased.  Nor does the record reflect that the Plan's status as a "defined contribution plan" requires dismissal.  Plaintiffs acknowledge that their payments are based on the amount contributed to their retirement when they worked, but they claim that once the Board calculated the monthly payment amount (at each participant's retirement) that amount was guaranteed to never decrease.

At this point, based solely on the pleadings and Plan Documents, the Plan Documents appear ambiguous as to whether participants were guaranteed a fixed monthly annuity amount.

### 4.      Whether Plaintiffs Allege Breach, Damages, and Causation

The SAC sufficiently alleges that the Board breached its obligations under the Plan Documents to provide a fixed monthly payment.  Plaintiffs claim that

the Board breached the terms of the Plan because, although the Plan promised

that Plaintiffs' annuity benefits were guaranteed for life and that all increases to

those benefits would be permanent, the Board implemented an across-the-board

9% decrease in the participants' monthly annuity benefits.  (SAC ¶¶ 1, 3.)

Defendants assert that the Board never stopped paying the monthly

annuities, and the reduction in the amount of monthly payments was made to

ensure that, in a declining market, the annuity payments would continue for the

participants' lifetimes.  They note that the Board is only permitted to provide

payments out of the Annuity Fund and only to the extent that the Annuity Fund

is adequate.  Defendants claim that, by decreasing the monthly payments, the

Board fulfilled its fiduciary duty to preserve the Annuity Fund's long-term

viability in order to meet the needs of future participants.   See, e.g., PIA, Minn.

Stat. § 501B.151, subd. 2(c) (providing that trustee may consider general

economic conditions, needs for regularity of income, and preservation of capital

in administering the trust); Varity Corp. v. Howe, 516 U.S. 489, 514 (1996) ("The

common law of trusts recognizes the need to preserve assets to satisfy future, as

well as present, claims and requires a trustee to take impartial account of the

interest of all beneficiaries.") (citation omitted).  Defendants conclude that the

Board did not cause damage to Plaintiffs, but rather, minimized the damage

inflicted by the market downturn and recession.  The Court does not have the

information necessary to conclude whether, in fact, a cut in payments was

required to preserve the Fund, the amount of any required cut, or whether the

Fund's underfunding was, itself, a breach of fiduciary duty.  The question of

whether the Board's actions were required by – or a breach of – its fiduciary duty

is one that cannot be resolved at the motion to dismiss stage.  See Triple Five of

Minn., Inc. v. Simon, 404 F.3d 1088, 1095 (8th Cir. 2005) (noting that "[w]hether a

breach of fiduciary duty has actually occurred is a factual issue").

Plaintiffs have also adequately pled that Defendants' breach of contract

caused damages – namely, the Board's improper reduction of guaranteed

payments by 9%.

### D.      Count Two: Whether Plaintiffs State a Claim for Breach of Fiduciary Duty

To state a common law claim for breach of fiduciary duty, a plaintiff must

plead "the existence of a fiduciary duty, breach, causation and damages." Hot

Stuff Foods, LLC v. Dornbach, 726 F. Supp. 2d 1038, 1043 (D. Minn. 2010)

(citations omitted).  The PIA requires trustees to "exercise reasonable care, skill,

and caution" to "invest and manage trust assets as a prudent investor would, by

considering the purposes, terms, distribution requirements, and other circumstances of the trust."  Minn. Stat. § 501B.151, subd. 2(a).  The Plan Documents also require the Board to invest and manage the Annuity Fund in accordance with the prudent investor rule.

### 1.    Plaintiffs' Allegations of Underfunding

As explained above with respect to the breach of contract claim, the SAC adequately alleges that the Board breached its fiduciary duties by reducing the monthly annuity payments.  Furthermore, the SAC alleges that the Plan was underfunded in the first place because the Board failed to prudently manage and invest the Annuity Fund.  (SAC ¶¶ 78-79.)  The SAC sufficiently pleads that it was the Board's own improper conduct that placed it in a position to need to violate the Plan terms.

### 2.    Defendants' Claim of Good Faith

Defendants assert that the Board is shielded from liability because it was acting in good faith.  See Norwest Bank Minn. N., N.A. v. Beckler, 663 N.W.2d 571, 580-81 (Minn. Ct. App. 2003). ("[S]o long as the trustees act in good faith, from proper motives, and within the bounds of reasonable judgment, the court will not interfere with their decisions.") (citation omitted).  At this stage, the

Court rejects Defendants' argument.  The question of whether the Board acted

reasonably or in good faith cannot be answered on a motion to dismiss.  <u>See, e.g.,</u>

<u>In re ADC Telecommc'ns, Inc., ERISA Litig.</u>, Master File No. 03-2989

(ADM/FLN), 2004 WL 1683144, at *5 (D. Minn. July 26, 2004) (holding that

"[b]ecause the scope and practical effect of this duty will not be determined on a

motion to dismiss, it is premature to absolve the [defendants] of liability for

imprudent investments) (footnote omitted).

### E.      Whether Plaintiffs State a Disclosure Claim

In their opposition to the motion to dismiss, Plaintiffs argue that, even if,

under the terms of the Plan, the monthly annuity payments were subject to

market risks and reductions, Defendants breached their fiduciary duty by failing

to accurately communicate those risks to Plaintiffs in the Plan Documents.

Under Minnesota law, a trustee has the duty to "disclose to the beneficiary fully,

frankly, and without reservation all facts pertaining to the trust."  <u>Beckler</u>, 663

N.W.2d at 581 (citation omitted).  The SAC alleges that, "nowhere in the ELCA

Retirement Plan documents was there ever a disclosure that the lifetime annuity

payments were subject to any market risk."  (SAC ¶ 52.)

Although Plaintiffs have pointed to facts in the SAC and the Plan Documents to support their allegation of failure to disclose the risks associated with the annuity payments, Plaintiffs' legal claim that the Board breached its fiduciary duty by failing to communicate that the annuity payments were subject to market risk does not appear in the SAC.  Defendants were not clearly put on notice of this claim.  The Court grants Plaintiffs 30 days from the date of this Order to amend the SAC to add a claim for failure to disclose.

### F.    Count Three: Whether Plaintiffs State a Claim for Injunctive Relief

The Court dismisses Count Three: Request for Injunctive Relief, because, as Plaintiffs admit, injunctive relief is a remedy that they seek for Counts One and Two, not a separate cause of action.  The Court will not address the appropriateness of injunctive relief as a possible remedy at this stage of the litigation.

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED**:

Defendants' Motion to Dismiss [Docket No. 34] is **GRANTED IN PART** and **DENIED IN PART** as follows:

1.    Counts One and Two against the Board **REMAIN**.

2.      Count Three is **DISMISSED** as to both Defendants.

3.      Plaintiffs have 30 days from the date of this Order to amend the SAC to add a claim for failure to disclose against the Board.

4.      Plaintiffs' claims against ELCA are **DISMISSED**; however, the Court grants Plaintiffs 30 days from the date of this Order to amend the SAC to state a claim against ELCA.  If no amendment is made within 30 days, the claims against ELCA are **DISMISSED WITH PREJUDICE**.


Dated:   July 22, 2011                    s/ Michael J. Davis_____
                                          Michael J. Davis
                                          Chief Judge
                                          United States District Court