## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| Pastor Benjamin A. Johnson, Dr. Ronald A. Lundeen, Larry D. Cartford, and Pastor Arthur F. Haimerl, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) | Court File No. 11-cv-00023 (MJD/LIB) |
| Plaintiffs, | ) ) | **THIRD AMENDED** |
| v. | ) | **CLASS ACTION COMPLAINT** |
| | ) | |
| Evangelical Lutheran Church in America and Board of Pensions of the Evangelical Lutheran Church in America, | ) ) ) ) | <u>JURY TRIAL DEMANDED</u> |
| Defendants. | ) | |

## I.    <u>INTRODUCTION</u>

1.    Plaintiffs bring this class action on behalf of themselves and all other participants in the retirement plan offered by the Evangelical Lutheran Church in America ("ELCA") who received their retirement benefits in the form of a monthly annuity payment guaranteed for life. Defendants in this case promised that **Plaintiffs' annuity payments were guaranteed for life** and also that **increases in these guaranteed lifetime annuity payments would be permanent.** Despite Defendants' unequivocal promises to Plaintiffs, beginning in 2010 Defendants drastically reduced Plaintiffs' guaranteed lifetime annuity payments.

2.    Defendants provide and administer the ELCA Retirement Plan (referred to herein as the "Retirement Plan" or "Plan"). The Plan provides the option for Plan participants (referred to as "Sponsored Members") to elect to receive their retirement

93276

benefits in the form of a lifetime pension - also referred to by Defendants as an "annuity." The Plan documents that constituted the agreement between the parties (meaning the Plan itself and the yearly Summary Plan Descriptions) provide that, upon retirement, Sponsored Members may elect an "annuity option," whereby they convert their accumulated retirement accounts and investments into a series of monthly payments guaranteed for life. When a Sponsored Member elects the annuity option, they cannot retract the election and are locked into the annuity payment option. By electing the annuity option upon retirement, Sponsored Members give up their retirement accumulations, including the possibility that those accumulations will continue to grow as a result of market gains, and turn them over to Defendants. In return, Defendants guaranteed a specific monthly annuity payable for life and that increases to that annuity payment would be permanent. Plaintiffs and Class Members consist of the thousands of Sponsored Members who elected to receive their accumulated retirement benefits in the form of this guaranteed lifetime annuity.

3.     Notwithstanding this written agreement between the parties, in September 2009, John G. Kapanke ("Kapanke"), President and Chief Executive Officer of the Board of Pensions of the Evangelical Lutheran Church in America, wrote to Sponsored Members stating that the guaranteed annuity payments would be decreasing by 9% effective January 1, 2010, to be followed by additional decreases in 2011 and 2012. In November 2009, Defendants changed the written Plan documents to reflect for the first time that the guaranteed annuity payments were now retroactively subject to market risk and that, as a result, the payments could be reduced.

4.     Plaintiffs, on behalf of themselves and the Class Members, bring this class action to remedy the Defendants' fiduciary breaches and enforce the written agreement between the parties. Plaintiffs seek damages resulting from Defendants' breaches and wrongful conduct. Further, Plaintiffs seek equitable relief, including restoration of Plaintiffs' accounts and guaranteed annuity payments.

## II.     JURISDICTION AND VENUE

5.     Plaintiffs filed this lawsuit in the Minnesota Fourth Judicial District Court, Hennepin County, as required by the ELCA Retirement Plan, and Defendants removed Plaintiffs' lawsuit to this Court. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1332(d)(2)(A) and 1453. Based on Plaintiffs' allegations, the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and was filed as a class action in which at least one member of the Class is a citizen of a state different from at least one defendant. Moreover, the Plan documents that constitute the agreement at issue contain a choice-of-law provision that states, "[t]he Retirement Plan shall be construed and administered according to the laws of the State of Minnesota to the extent that such laws are not preempted by the laws of the United States of America."

6.     Venue in this District is proper pursuant to 28 U.S.C. § 1391 because some of the defendants reside in this District and Plaintiffs' causes of action, in part, arose in this District. Venue is also proper in this District because Defendants properly removed Plaintiffs' lawsuit to this District pursuant to 28 U.S.C. § 1453; the Plan documents that constitute the agreement at issue contain a venue selection clause expressly providing that "[a]ll controversies, disputes, and claims arising hereunder shall be submitted to the

Minnesota Fourth Judicial District Court, Hennepin County," which is within this District.

### III.   PARTIES

**A.   Plaintiffs**

7.      Pastor Benjamin A. Johnson served as an ordained minister to the Lutheran Church in America ("LCA") from May 25, 1965, through January 1, 1988, when the LCA was succeeded by the ELCA. Thereafter, he continued to serve as an ordained minister with the ELCA until his retirement on June 1, 1995. Upon retirement, Pastor Johnson elected the annuity option under the Plan and began receiving his monthly guaranteed annuity payments. As provided by the Plan, Pastor Johnson's annuity payments were increased permanently each year during the Class Period until January 1, 2010. Starting in January 2010, Pastor Johnson's annuity payments were reduced.

8.      Dr. Ronald A. Lundeen served the LCA and the ELCA related congregations and institutions, plus other organizations as both a minister and a stewardship expert from 1969 through 2001. His employers made payments on his behalf to the Board of Pensions. Dr. Lundeen retired on January 1, 2002. He elected the annuity option under the Plan but deferred his monthly guaranteed annuity payments from the ELCA until 2007. In 2007, Dr. Lundeen began receiving his monthly guaranteed annuity payments. As provided by the Plan, Dr. Lundeen's annuity payments were increased permanently each year during the Class Period until January 1, 2010. Starting in January 2010, Dr. Lundeen's annuity payments were reduced.

9.      Larry D. Cartford served as an LCA and ELCA Pastor from 1963 through 1991. Upon his departure from the ministry, Cartford became a District Representative for Aid Association for Lutherans ("AAL"), an insurance and investment firm. Upon his May 1, 2002 retirement, Cartford elected the annuity option under the Plan and began receiving his monthly guaranteed annuity payments. As provided by the Plan, Cartford's annuity payments were increased permanently each year during the Class Period until January 1, 2010. Starting in January 2010, Cartford's annuity payments were reduced.

10.      Pastor Arthur F. Haimerl served the United Lutheran Church in America ("ULCA") (which became the LCA) and the ELCA from 1959 through 2000. His employers made payments on his behalf to the Board of Pensions. Pastor Haimerl retired in February 2000. Prior to retirement, Pastor Haimerl directed that his retirement accumulations be invested in the Balanced Fund, and upon retirement in February 2000, he began receiving his monthly guaranteed annuity payments. As provided by the Plan, Pastor Haimerl's annuity payments were increased permanently each year during the Class Period until January 1, 2010. Starting in January 2010, Pastor Haimerl's annuity payments were reduced

**B.      Defendants**

11.      Defendant Evangelical Lutheran Church in America ("ELCA") is a non-profit corporation organized under Chapter 317A of the Minnesota Non-Profit Corporation Act. The ELCA was formed on January 1, 1988 as the result of a merger between the LCA, the American Lutheran Church, and the Association of Evangelical Lutheran Churches. The management and direction of the business of the ELCA is vested

in a board of directors known as the Church Council. The ELCA is a mainline Protestant denomination composed of 4.5 million members and nearly 10,300 congregations across the United States and the Caribbean.

12.     Defendant Board of Pensions of the Evangelical Lutheran Church in America ("Board of Pensions" or "Board") is a non-profit corporation organized under Chapter 317A of the Minnesota Non-Profit Corporation Act and is governed by a 17-member Board of Trustees that is elected from the churchwide membership of the ELCA. The ELCA established the Board of Pensions in 1988 to provide and administer retirement, health, and related benefits and services to more than 50,000 individuals and their families who serve through the ELCA and other faith-based organizations controlled by or associated with the ELCA ("Eligible Employers"). Employees of Eligible Employers who both work more than 20 hours per week and at least six months per year are eligible to participate in the ELCA benefits plan ("Eligible Employees"). Eligible Employees enrolled in the ELCA benefits plan are called Sponsored Members and Eligible Employers who enroll Eligible Employees in the plan are called Participating Employers. As of December 31, 2009, there were 51,481 Sponsored Members, 10,473 of whom were retired.

## IV.     FACTUAL ALLEGATIONS

### The ELCA Retirement Plan

13.     Since 1988, the ELCA has offered Eligible Employees a defined-contribution retirement plan (referred to throughout this Complaint as the "ELCA Retirement Plan" or "Plan") under the provisions of Internal Revenue Code ("Code")

§403(b)(9) whereby the Participating Employers make defined contributions on behalf of and into their accounts. The terms and conditions of the ELCA Retirement Plan are set forth in the Plan documents, which include the Summary Plan Description.

14.     The Summary Plan Description was published and disseminated to Class Members every year during the Class Period. It describes the terms and conditions of the ELCA Retirement Plan in detail and explains eligibility, how contributions are made, the various investment options, including the risks and benefits of each, what to do when approaching retirement, options for retirement, and what Sponsored Members are entitled to receive at retirement under the different options available. The Summary Plan Description also defines certain terms used by the Board of Pensions to describe investment options under the Plan. Sponsored Members are instructed to "[u]se [the Summary Plan Description] as a reference tool and the first place to check when you have questions about your retirement account or plan benefits." The Plan itself was available to Sponsored Members if the Summary Plan Description did not answer a particular question but was not sent to Sponsored Members in the ordinary course.

15.     In general, the Plan works as follows: Participating Employers make contributions to the individual accounts of each Sponsored Member based on a defined percentage of compensation (during a portion of the Class Period, Sponsored Members could also make contributions themselves). Sponsored Members then select from a variety of investment options including equity funds, balanced funds, bond funds, or money-market funds in which to direct these retirement contributions.

16.     Upon retirement, Sponsored Members elect to receive retirement accumulations either as withdrawals from the various investment accounts or as a monthly annuity payment guaranteed for life. Sponsored Members choose either option or a combination of the two options. The lifetime guaranteed annuity option has been a component of the Plan since its inception and before 2001 it was a Sponsored Members' only option. Prior to 2003, the annuity option was referred to as a "pension" although it was administered and operated in the same manner as the annuity option. There were other changes to the Plan over the years that expanded the options for retirement withdrawals, but those changes did not impact the annuity option. This case involves **only** the lifetime annuity option (referred to prior to 2003 as the "pension") under the Plan.

### The Lifetime Guaranteed Annuity (The Plan from 1988 through 2002)

17.     From January 1, 1988 through December 31, 2002, Sponsored Members participated in the ELCA Regular Pension Plan (the "Pension Plan" or "Plan"). The Pension Plan was a defined contribution plan under the provisions of §403(b)(9) of the Code and a church plan exempt from ERISA under Code §414(e) and ERISA §3(33).

18.     Under the Pension Plan, the Board of Pensions established accounts for each Sponsored Member. Participating Employers then made an annual contribution to each Sponsored Member's account based on a percentage of the Sponsored Member's defined compensation. Before retirement, the pension accounts were considered "active" and Sponsored Members chose how to direct the investments. Sponsored Members had the option of letting the Board of Pensions select the mix of stocks, bonds, and other

assets, or Sponsored Members could select their own allocations among the funds offered. For example, Sponsored Members could choose to allocate their retirement contributions among four types of funds:

- <u>Stock funds</u>: Invested primarily in common stocks, including publicly traded U.S. stocks, foreign stocks and private equities;

- <u>Balanced funds</u>: Invested in a combination of stocks and bonds as determined by the Board of Pensions;

- <u>Bond funds</u>: Invested in publicly traded bonds; and

- <u>Money-market fund</u>: Invested in publicly traded short-term loans to corporations and governments.

19.     Upon reaching the age of 60, or after having completed 30 years of ELCA service, an employee could retire and receive monthly retirement benefits.  ELCA employees also had the option to defer pensions benefits until the age of 70 ½.  *See e.g.* 2000 SPD at 22.

20.     During this period of deferred retirement, Sponsored Members could transfer all or some of their ELCA retirement accounts to the Transitional Pension Fund. As described in the 2000 Summary Plan Description:

> Once you reach age 60 or complete 30 years of ELCA service, you have the option of transferring part or all of your Regular Pension Plan account to the Transitional Pension Fund. Investing in this fund allows you to reduce the possibility of short-term loss prior to starting your pension, while maintaining investment growth associated with long-term expected returns. The Transitional Pension Fund is a balanced fund and receives annual interest credits. You may make a lump-sum transfer or gradual transfers over a period of time to the Transitional Pension Fund. Once you transfer an amount to the Transitional Pension Fund, you **cannot** transfer that amount back to the plan's seven investment

> funds. Although amounts transferred to this fund are **not available** for withdrawal, they are used in calculating your withdrawal limits. If 100 percent of your basic account has been transferred to the Transitional Pension Fund, all subsequent contributions will be credited to this fund, unless you elect otherwise. You can make transfers to this fund up to 90 days before you start your monthly pension.

2000 SPD at 20-21.

21.     Sponsored Members were also permitted to withdraw certain amounts from their retirement accounts before starting their pensions.  As described in the 2000 Summary Plan Description:

> Once you reach age 60 or separate from ELCA service, a portion of your basic account may be withdrawn. You may request a withdrawal in a single payment or series of monthly payments. You may also roll over your withdrawal into another tax-deferred account such as the Optional Pension Plan. Withdrawals can be requested up to 90 days prior to the date you start your lifetime monthly pension. The withdrawal feature allows you to tailor the payment of benefits to meet your needs. For example, before beginning your lifetime monthly pension, you may withdraw funds to supplement earnings from part-time employment or to make a down payment on a house. Withdrawals will, however, reduce your pension account and the amount of your lifetime monthly pension.

22.     Withdrawals were limited to a one-time withdrawal of 20% (or $20,000 if greater) and an annual limit thereafter of 10% (or $10,000 if greater).  Thus, a plan participant could withdraw approximately 70% of their accumulated account balance between the ages of 60 and 70 ½.

23.     Upon retirement, the Board of Pensions no longer considered Sponsored Members' accounts "active," and the only option was for the Sponsored Member to

receive a lifetime monthly pension based on the total accumulations in the underlying accounts.

24.     From 1988 through 1996, retired Sponsored Members' monthly pension payments were paid out of the specific accounts in which each Sponsored Member invested. For example, if a Sponsored Member was invested 100% in the balanced fund, pension payments were made from the balanced fund. On the other hand, if a Sponsored Member was invested 50% in the balanced fund and 50% in the stock funds, pension payments were based on the respective allocations in those funds. The amount of the Sponsored Members' initial monthly pension payments were based on the accumulations in the accounts, an assumed rate of interest, and the actuarial life expectancy of the Sponsored Member or contingent beneficiary. Before retirement, Sponsored Members had the option of moving their accumulations from the stock or money-market funds to the balanced or bond funds. This was a significant consideration because the Plan documents expressly provided that: **"there will be no downward adjustment of the basic pension coming from a bond or balanced fund."**

25.     The Plan documents also provided that the monthly pension payments from the bond or balanced funds could increase if earnings warranted such an increase and that any such increase would be for the Sponsored Member's remaining lifetime. For instance, the 1995 Summary Plan Description stated the following:

> If in future years the earnings credited to one of the bond funds and/or balanced funds is greater than the 4.5 percent that is assumed for the purpose of calculating the monthly pension, the Board of Pensions can declare that an excess interest amount be paid. **If such an amount is declared, it**

**will be used to increase the pension throughout the Member's remaining lifetime.**

26.     Starting in January 1997, the Plan documents were amended to provide that, upon retirement, all of the Sponsored Member's investment accumulations would be transferred to a "Pension Reserve Fund" and that all lifetime pension payments would be made out of this new fund instead of the specific funds (such as the bond, stock or balanced funds) in which the Sponsored Member was invested:

27.     Despite this change in the source of the pension payments, the 1997 Plan documents repeated the promise of a lifetime monthly pension upon retirement: "By paying pensions from a single fund – instead of from individual accounts – **the plan is able to provide payments throughout the member's lifetime, as well as the contingent annuitant's lifetime (if applicable)**." Likewise, the promise that increases in the pension payments were permanent was repeated: "**the Board may increase all future pension benefits** on the following Jan. 1. **The increase – if any – will apply to all pensions payable to the member, the contingent annuitant, and beneficiaries.**" During this time, pension payments to Sponsored Members were moderately increased and the promise that these increases were permanent was repeated. For instance, in January 2000, the Board of Pensions sent letters to all retirees receiving a pension setting forth specific percentage increases in guaranteed pension payments and specifically stating that the increases were "permanent".

28.     In 2001, the Plan documents touted a new upcoming option for Sponsored Members. Instead of requiring that all investment accumulations be converted into a

lifetime monthly pension to be paid out of the Pension Reserve Fund upon retirement, Sponsored Members had the option of keeping their accounts "active" and taking their retirement accumulations in the form of withdrawals (the "Pension Reserve Fund" was also renamed the "Pensioner Reserve Fund" at this time.)

29.     The 2001 Summary Plan Description, under the heading "Upcoming Plan Changes" stated:

> Although this is currently not an option, later this year it will be possible to annuitize part of your retirement account, while leaving the other part "active." This will offer **the promise of a lifetime monthly pension income**, while allowing a portion of the account to continue to grow. . . .

30.     According to the 2001 Summary Plan Description, the implication of leaving an account "active" as opposed to annuitizing was that it remained "**subject to market gains and losses**." Although the payments were referred to a "pension payments" at this time, the Plan documents refer to the conversion of retirement accumulations into lifetime pension payments as "annuitizing."

31.     Under the heading "A few things to consider," the 2001 Summary Plan Description stated as follows:

> If you leave your retirement account "active,"
>
> - you **do not** have a guarantee of a lifetime monthly pension payment, and
>
> - the accumulations in your account are vulnerable to the fluctuations in the market.
>
> If you annuitize your retirement account, you **cannot** make
>
> - withdrawals,

- rollovers, or

- investment decisions.

32.    The 2001 Summary Plan Description repeated the promise of a guaranteed

lifetime monthly pension upon retirement in the section entitled: "Retirement income –

lifetime monthly pension":

> The pensioner reserve is a balanced fund (managed by the
> Board of Pensions) from which all lifetime pension benefits
> are paid. When you annuitize your retirement account, your
> accumulations are transferred to the pensioner reserve and
> pooled with all other accumulations.

> By paying pensions from a single fund, instead of from
> individual accounts, **the plan is able to provide you (and
> your joint annuitant) a lifetime monthly pension.**

33.    The 2001 Summary Plan Description restated the promise that any

increases to that lifetime pension payment would be <u>permanent</u>:

> The Board of Pensions' goal is to increase the amount of your
> lifetime monthly pension income at approximately the rate of
> inflation (3 percent to 5 percent), over a period of years. **Any
> increase is permanent and applies to all payments made to
> you, your joint annuitant and beneficiaries**.

> The Board of Pensions determines the increase each year by
> comparing the actual investment earnings of the pensioner
> reserve (averaged over several years) to the assumed 4.5
> percent investment rate of return used to calculate your initial
> lifetime monthly pension amount. The Board of Pensions also
> adjusts for any changes in mortality experience. When
> investment earnings exceed the assumed 4.5 percent rate of
> return, **your monthly pension is permanently increased** the
> following Jan. 1 by the excess earnings.

34.     The 2002 Summary Plan Description made similar disclosures and emphasized the implications of leaving an account "active' as opposed to converting to an annuity:

> The plan underwent a major change in 2000. You are no longer required to convert all or any of your Regular Pension Plan accumulations to an annuity.
>
> If you leave all of your accumulations "active,"
>
> - you do not have a guarantee of a lifetime monthly pension payment, and
>
> - the accumulations in your account are vulnerable to the fluctuations of the market.
>
> During this time, from pension payments to Sponsored Members were moderately increased and the promise that these increases were permanent was repeated. For instance, a January 2002 letter sent to retirees receiving a pension specifically set forth a "permanent increase" to the guaranteed lifetime payments under the pension plan.

**The Lifetime Guaranteed Annuity (The Plan from 2003 through November 2009)**

35.     On January 1, 2003, the ELCA amended and restated the Pension Plan, now called the Evangelical Lutheran Church in America Retirement Plan (still referred to herein as the "ELCA Retirement Plan" or "Plan"). The Plan continued to be a defined-contribution plan under §403(b)(9) of the Code and claimed to be exempt from ERISA because it met the requirements of a "church plan" under Code §414(e) and ERISA §3(33).

36.     The 2003 ELCA Retirement Plan as amended and restated operated the same way as—and retained the same characteristics of—the Pension Plan. Other than

93276                                                         15

some different terminology (such as dropping the word "pension" in favor of "annuity"), the primary difference was that it offered Sponsored Members expanded fund choices and withdrawal options upon retirement.

37.     The 2003 ELCA Retirement Plan continued to have the identical option for Sponsored Members to elect a lifetime payment—the same as offered under the previous Pension Plan—except the Plan now referred to this option only as the "annuity" option.

38.     According to the 2003 Summary Plan Description, initial monthly annuity payments continued to be calculated in the same way as under the Pension Plan based on the value of the retirement accumulations; the form of pay-out chosen; the life expectancy of the Sponsored Member and any contingent annuitant; and an assumed return of 4½ percent. The 2003 Summary Plan Description again touted the stability of the lifetime annuity option:

> **Receiving a lifetime monthly annuity income**
>
> An annuity provides a lifetime monthly income to you and any co-annuitant. . . .
>
> **Starting a lifetime monthly annuity**
>
> If you are annuitizing some or all of your account, you select the month to begin receiving annuity payments, as well as the amount and type of accumulations to be annuitized. During the month prior to annuitization, the Board of Pensions will ensure the necessary accumulations are transferred to the Participating Annuity Bridge Fund, and later moved to the Participating Annuity Fund (the source of all lifetime annuity benefits). You cannot make any changes to these accumulations after this occurs. . . .

39.     The 2003 Summary plan Description continued to tout the "Participating Annuity Fund" (formerly the "Pensioner Reserve Fund"), as the source of lifetime annuity payments:

> The Participating Annuity Fund is a balanced fund from which all lifetime annuity benefits are paid. When you annuitize your retirement account, your accumulations are transferred through the Participating Annuity Bridge Fund to this fund and pooled with all annuitized accumulations. By paying annuities from a single fund instead of from an individual account, **the plan is able to provide you (and your co-annuitant) a lifetime monthly annuity.**

40.     The 2003 Summary Plan Description glossary further defined "Lifetime annuity income" as a guaranteed payment until death: **"A guarantee that you (and your co-annuitant, if applicable) will receive a monthly annuity income until you (and your co-annuitant) die."** Defendants repeated the same definitions in the 2004, 2005, 2006, 2007, and 2008 Summary Plan Descriptions.

41.     The 2003 Summary Plan Description repeated the unequivocal promise contained in the earlier Summary Plan Descriptions that any future benefit increases would be permanent and applied to all future payments:

> The goal of the Board of Pensions is to increase the amount of your lifetime monthly annuity at approximately the rate of inflation over a period of years. **Any percentage increase applies to all payments made to you, your co-annuitant and beneficiaries**.
>
> Each year the Board of pensions determines the rate of interest to credit the Participating Annuity Fund by using a smoothing formula that blends the fund's long-term expected rate of return and its actual 12-month return, then adjusting for mortality experience.

> The first 4.5 percent of interest credited each year is used to continue existing annuity payments. Any interest credited in excess of 4.5 percent is available for annuity increases, which are applied the following Jan. 1.

42.     The 2004 Summary Plan Description repeated and reinforced the same message. In the section titled "Receiving a lifetime monthly annuity income," it stated:

> **Annuitizing to provide income for life**
>
> Annuitizing some or all of your retirement account balance will provide you (and any co-annuitant designate) with a monthly income for life – protecting you from outliving your savings.

43.     The same promise was repeated in the 2005 and 2006 Summary Plan Description, although, the phrase "protecting you with lifelong retirement income" was substituted for "protecting you from outliving your savings." In 2007 and 2008 the Summary Plan Descriptions simply stated "[a]nnuitizing some or all of your retirement account balance will provide you (and any co-annuitant designate) with a monthly income for life."

44.     The 2004 Summary Plan Description further described the Participating Annuity Fund as the source of not only steady, but growing lifetime income:

> **Steady, growing lifetime income**
>
> When you annuitize all (or some) of your account balance, the annuitized amount is moved into the Participating Annuity Fund, a special balanced fund designed to achieve attractive long-term investment returns that help your annuity payments keep pace with inflation.
>
> As year-to-year market returns fluctuate, the Board of Pensions also uses a unique tool – the interest crediting rate –

to stabilize your annuity income, with the goal of increasing your monthly annuity payments every year.

**The Participating Annuity Fund and interest-crediting rate work together to deliver you a lifetime stream of annuity income that grows steadily over the years.**

45.     The same description was included in the 2005, 2006, and 2007 Summary Plan Descriptions, with the caveat that beginning in 2007, the Participating Annuity Fund was renamed the "ELCA Annuity Fund," and in 2008, the identical text appeared under the heading "**Lifetime income**," instead of "**Steady, growing lifetime income**."

46.     The same promise that all increases were **permanent** was repeated in the 2004, 2005, 2006, 2007 and 2008 Summary Plan Descriptions. Beginning in 2007, the Participating Annuity Fund was renamed and referred to thereafter as the ELCA Annuity fund. For instance, in a 2007 letter informing Sponsored Members of several administrative changes, the Board of Pensions reiterated that: "If you retired after 1986, your ELCA Annuity **will continue to be eligible for annual permanent increases.**" Notably, from at least 1999 through 2008, the Board of Pensions did in fact modestly increase annuity payments and – by the explicit terms of the agreement – guaranteed those percentage increases were permanent. Plan documents and other communications to Sponsored Members consistently stated that increases in the lifetime annuity payments were permanent – such as a January 2008 letter from the Board of Pensions which reiterated the permanent nature of the lifetime payments from the "ELCA Annuity" fund stating Sponsored Members would be receiving a "1.7% permanent increase" in their annuity payment.

**Defendants Try to Retroactively Change Their Obligations Under the Plan**

47.     Despite the plain language in the ELCA Retirement Plan since its inception – that Sponsored Members could rely on their guaranteed annuity payment for life; that any increases to that payment were permanent; and that market gains and losses were exchanged for this promise of stability – in December 2008, the Board of Pensions sent a letter stating for the first time, that annuity payments were, in fact, subject to market risk. Moreover, the letter stated that Sponsored Members should expect their annuity payments to be decreased in 2010.

48.     In about June 2009, the Board of Pensions issued its 2008 Annual Report. In a dramatic departure from prior years' Annual Reports, the description of the ELCA Annuity Fund (from which all pension and annuity payments are made) came draped in disclosures about potential market risk. For example, on the second page, under the table of contents, in a shaded box under the heading "About our funds" was a brand new disclaimer:

**About our funds**

> You should carefully consider the investment objectives, risks, charges and expenses of any fund before investing in it. **All funds, including the ELCA Annuity Fund, are subject to risk.** Past performance cannot be used to predict future performance. The Board of Pensions' fund, including our annuity fund, are not insured or guaranteed by the Federal Deposit Insurance Corporation or any other government agency. Fund assets are invested in multiple sectors of the market. Some sectors, and therefore the funds, may perform below expectations and lose money over short or extended periods. With respect to the Annuity Fund, the goal of the Board of Pensions is to increase a member's annuity income over time. **However, substantial or extended losses or**

**underperformance in the markets could cause a reduction
in monthly annuity payments**.

49.     Board of Pensions CEO Kapanke wrote to Sponsored Members in

September 2009, stating that the deficit gap between the assets in the ELCA Annuity

Fund and the projected lifetime benefits to members was 26%. The letter informed

Sponsored Members that: "Effective January 1, 2010, monthly annuity payments will be

decreased by 9%" and further that "the Board of Pensions anticipates that monthly

annuity payments will be decreased by an additional 9% in both 2011 and 2012."

50.     The letter continued, suggesting that prior ELCA Retirement Plan

documents had fully explained that the guaranteed lifetime annuity payments were as

subject to market risks, like all other investments, and subject to reduction:

> As a reminder, all annuity payments will continue to be
> subject to additional adjustment, as necessary, based upon
> market conditions. In the past, members have benefited from
> market increases. However, as we have stated previously in
> our plan communications, annual report and other disclosures,
> substantial losses or underperformance in investment markets
> can cause a reduction in monthly annuity payments. All funds
> including the ELCA Participating Annuity and Bridge Fund,
> are subject to risk and past performance cannot be used to
> predict future performance.

51.     In September 2009, the Board of Pensions also distributed a summary sheet

to Sponsored Members titled "ABOUT THE ELCA PARTICIPATING ANNUITY AND

BRIDGE FUND – Summary of Features." Contrary to the terms of the ELCA Retirement

Plan, and Defendants' prior disclosures, the Summary of Features stated, **"[t]he Fund

takes a certain amount of investment risk on behalf of annuitants to achieve

investment returns sufficient to fund increases in annuity payments over time."** And

93276                                        21

further, with respect to the interest credit aspect of the ELCA Annuity Fund, stating for the first time, "**if the investment returns of the Fund (averaged over time) fall short of the 4.5% assumed rate, it may become necessary to reduce annuity payments**".

### Defendants Change the Written Plan Documents for the First Time to Reflect Market Risk & Annuity Reduction

52.     In November 2009, the Board of Pensions formally changed the ELCA Retirement Plan documents, retroactively effective to January 1, 2009. The 2009 Summary Plan Description amended the disclosures to include market risk and changed the language indicating that lifetime annuity payments could be reduced. For example, attached to the Summary Plan Description was an "Important Notice" which stated that "[a]ll funds, including the ELCA Participating Annuity and Bridge Fund, are subject to risk."

53.     The 2009 Summary Plan Description contained new descriptions of the ELCA Annuity Fund that were completely at odds with the way the ELCA had described the Plan in all previous Plan documents:

> **The ELCA Annuity Fund, like other investments, participates in the gains and losses of the market.** It is designed to strike a balance in which it can experience greater long-term returns (10 or more years) than bonds alone, while experiencing less fluctuation than stocks alone. Each year the Board of Pensions determines the rate of interest to credit to the ELCA Annuity Fund based on a smoothing formula that blends the fund's long-term expected rate of return with its actual 12-month return and adjusts according to life expectancy.
>
> The first 4.5 percent of interest credited each year is used to continue existing annuity payments. Any interest credited in excess of 4.5 percent is available for annuity increases, which

are applied the following Jan. 1. Any percentage increase will apply to all payments made to you, your co-annuitant and beneficiaries. **If the interest credited is less than 4.5 percent, annuity payments may decrease.**

54.     Notwithstanding the recent attempts to retroactively amend the promises to Sponsored Members' highlighted above, in each year during the Class Period, the Plan documents made the same promise that Sponsored Members who elected the annuity option would receive **a guaranteed lifetime monthly income**. And in each year, the Plan documents made the same promise that **any increases** to the monthly annuity payment amount **were permanent** and applied to **all future payments**.

55.     Defendants' attempts to rewrite history and backdate disclosures and terms in the Plan documents is not proper and is not permitted based on the terms of the agreement itself. Section 12.12(d) of the Plan provides that: **"No amendment shall reduce the Account balance of any individual or reduce the amount of retirement benefit or annuity benefit in pay status on the effective date of the amendment."**

56.     Significantly, during the Class Period, nowhere in the ELCA Retirement Plan documents was there ever a disclosure that the lifetime annuity payments were subject to any market risk. Indeed, the Plan documents compared the consequences of selecting the annuity to leaving an account "active" explaining that an "active" investment account is "vulnerable to the fluctuations of the market," and "you do not have a guarantee of a lifetime monthly pension payment."

**The Board of Pensions is a Mere Instrumentality of the ELCA; Alternatively, the Board is the Alter Ego of the ELCA**

57.     Although the ELCA and the Board of Pensions are separately incorporated entities, both entities are responsible for the ELCA Retirement Plan. The Board of Pensions is an alter ego or instrumentality of the ELCA, and injustice and fundamental unfairness would result if the ELCA is not held accountable for the liabilities resulting from shortfalls in the ELCA Retirement Plan due to undercapitalization or the Board of Pensions' lack of resources to cover its liabilities.

58.     The Board of Pensions would not exist if it did not function for, and at the direction of, the ELCA. The Board of Pensions was created by the ELCA to administer its employee benefit plans and manage the trusts for those plans (ELCA Constitution chapter 17); the Board has no independent basis for existence. The ELCA describes the Board of Pensions as one of its "service units," which are defined by the ELCA as units "of the ELCA churchwide organization assigned particular responsibility for services on behalf of churchwide programs and, in certain units [such as the Board of Pensions], for specific services to [ELCA] members." Indeed, the ELCA describes the churchwide organization and its service units, including the Board of Pensions, as one of the ELCA's three "expressions," which it declares are organized as "one church body" and "are all part of the ELCA."

59.     The ELCA controls the Board of Pensions. The Board's trustees are elected by the ELCA. The Board is governed by the ELCA Constitution and ELCA Bylaws 17.61.01-17.61.07 and Continuing Resolutions 17.61.A05, 17.61.B05 and 17.61.C09.

The ELCA requires that: (1) the Board be responsible to and must report to the ELCA, and (2) the Board's policies, procedures, and operations shall be approved by the ELCA. (ELCA Constitution chapter 16.12; ELCA Bylaw 14.21.02.)

60.     The ELCA has the ultimate authority over changes in the ELCA retirement plan benefits administered by the Board. The ELCA's bylaws require that any significant increase or decrease in benefits to members under the ELCA Pension and Other Benefits Program must be approved by the ELCA. (ELCA Bylaw 17.61.02.) The decrease in benefits, the breach of contract and the breaches of fiduciary duties alleged herein could not have occurred without the ELCA's affirmative approval or its failure to act as required by its constitution, bylaws and continuing resolutions.

61.     High-ranking ELCA officials—the ELCA presiding bishop, one bishop elected by the ELCA's Conference of Bishops, and the treasurer of the ELCA—serve on the Board's Board of Trustees. (ELCA Bylaw 17.61.03.)

62.     The ELCA hires, fires and sets the salary of the Board's president.  While ELCA Bylaw 17.61.06 states that the ELCA's presiding bishop and the Board of Pensions' Board of Trustees together elect the president of the Board of Pensions, the ultimate authority rests with the ELCA: the Board's president cannot be hired unless his or her hiring and salary is approved the ELCA's presiding bishop. Similarly, the Board cannot fire its president without the ELCA presiding bishop's approval. (ELCA Bylaw 17.61.06.)

63.     The Board and the ELCA share the same federal tax group exemption letters. Under Internal Revenue Service procedures, the subordinate Board of Pensions

must be affiliated with the ELCA and subject to the ELCA's general supervision and control.

64.     The Board must follow the ELCA's personnel policies (ELCA Bylaw 14.21.06), further indicating it is a mere instrumentality or alter ego of the Board.

65.     Plaintiffs, on behalf of themselves and the Class Members, now seek to enforce the terms of the ELCA Retirement Plan; to restore their annuity payments to the agreed-upon amounts; and to obtain damages relating to Defendants' wrongful conduct.

## V.     CLASS ACTION ALLEGATIONS

66.     **Class Definition**. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of themselves and the Class defined as: All persons in the United States who elected, from January 1, 1988 through November 2009 pursuant to the ELCA Retirement Plan, to receive retirement accumulations in the form of a lifetime annuity or pension.

67.     **Numerosity**. Plaintiffs do not know the exact size of the Class since this information is in Defendants' exclusive control. However, Plaintiffs estimate that there are over 10,000 Class Members who are geographically dispersed throughout the United States and abroad. As such, joinder of all Class Members would be impracticable.

68.     **Commonality.** Common questions of fact and law exist as to all Class Members and predominate over any questions solely affecting individual Class Members. The common questions of fact or law common to the Class include, but are not limited to:

a.      Whether the Retirement Plan promised Plaintiffs and Class Members a guaranteed annuity payment for life and that increases to that lifetime payment would be permanent;

b.      Whether Defendants breached the terms of the Retirement Plan by reducing Plaintiffs' and Class Members' annuity payments;

c.      Whether Defendants' owed a fiduciary duty to Plaintiffs and Class Members' to act prudently and solely in their interests;

d.      Whether Defendants breached their fiduciary duty by failing to act prudently and solely in the interests of the Plaintiffs and Class Members;

e.      Whether Defendants failed to disclose material information in the Retirement Plan documents and other communications regarding the guaranteed lifetime payments and the permanent nature of increases to annuity payments and the potential market risk associated with electing the pension to or annuity option;

f.      Whether Defendants injured Plaintiffs and the Class and the appropriate measure of those damages;

g.      Whether injunctive relief is appropriate and what specific injunctive relief should be ordered.

69.    **Typicality.** Plaintiffs' claims are typical of other Class Members' claims, because they have been denied the benefit of the agreement with Defendants and have suffered damages of the same type and in the same manner as the Class they seek to represent. All Class Members, including Plaintiffs, are similarly affected by Defendants' wrongful conduct.

70.   **Adequacy**. Plaintiffs can and will fairly and adequately represent and protect the Class Members' interests and have no interests that conflict with or are antagonistic to the Class Members' interests. Moreover, Plaintiffs' attorneys are experienced and competent in class-action litigation.

71.   **Rule 23 (b)(2).** Class action status also is warranted under Rule 23(b)(2) because Defendants have acted on grounds that apply generally to the Class, so that final injunctive relief is appropriate respecting the Class as a whole.

72.   **Rule 23(b)(3).** Class action status also is warranted under Rule 23(b)(3) because the questions of law and fact outlined above predominate over any individual questions that may exist within the Class. A class action is superior to other methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, effectively, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by many Class Members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint. This Class action presents no difficulties in management that would preclude maintenance as a class action.

## VI.    CLAIMS FOR RELIEF

### COUNT I: BREACH OF CONTRACT
### (Against Both Defendants under Minnesota Law)

73.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

74.    The terms of Plaintiffs' and the Class Members' Retirement Plan benefits, which are set forth in the written Plan documents, constitute a valid and binding contract between Plaintiffs Class Members and Defendants.

75.    By virtue of the contractual relationship between Plaintiffs and the Class and Defendants, the parties agreed that by annuitizing some or all of Plaintiffs' and the Class Members' retirement account contributions upon retirement: (a) Plaintiffs and the Class Members are guaranteed lifetime monthly annuity payments and that; (b) increases to Plaintiffs' and the Class Members' monthly annuity payments are made on a permanent basis.

76.    The obligations set forth above are material terms of the contract.

77.    Plaintiffs and the Class Members accepted the contract terms by electing the annuity option under the ELCA Retirement Plan and then committing funds to the Plan.

78.    Plaintiffs and the Class Members fully performed, and are ready, willing, and able to perform, all conditions precedent to Defendants' duty to make monthly annuity payments to Plaintiffs and the Class Members in the amount agreed upon under the terms of the contract described above.

93276

79.     Nevertheless, in September 2009 Kapanke announced that the monthly annuity payments of Plaintiffs' and the Class Members' would be reduced by 9% in 2010 and by an additional 9% in both 2011 and 2012.  Plaintiffs' and the Class Members' monthly annuity payments under the Plan have since been reduced by 9% for 2010 and have been reduced an additional 6% from January 2011 through the filing of this Third Amended Complaint.

80.     The ELCA had the ultimate authority over the 2009 decision to reduce annuity payments and its actions resulted in the reductions. The ELCA's bylaws require that any significant increase or decrease in benefits to members under the ELCA Pension and Other Benefits Program must be approved by the ELCA. (ELCA Bylaw 17.61.02.) The decrease in benefits could not have occurred without the ELCA's affirmative approval or its failure to act as required by its constitution, bylaws and continuing resolutions. Under the documents governing the ELCA and the Board, the Board does not have the authority, and cannot act alone, to reduce annuity payments.

81.     By reducing Plaintiffs' and Class Members' monthly annuity payments both Defendants breached the parties' contract.

82.     As a direct and proximate result of Defendants' breach of contract, Plaintiffs and the Class Members have and will sustain damages in an amount to be determined at trial.

## COUNT II: BREACH OF THE FIDUCIARY DUTY OF PRUDENCE
### (Against the Board of Pensions of the Evangelical Lutheran Church in America under Minnesota Common and Statutory Law)

83.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

84.     During the Class Period, the Board of Pensions was a fiduciary of the Plan and a *de facto* fiduciary pursuant to Minnesota law. Pursuant to the Plan documents, the Board of Pensions controls and manages the operation and administration of the ELCA Retirement Plan and makes all decisions and determinations incident thereto.

85.     The scope of the fiduciary duties and responsibilities of the Board of Pensions include operating and managing the Plan and its assets for the following purposes:

a.      Providing benefits to Plaintiffs and the Class Members and defraying reasonable expenses of administering the Plan;

b.      with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

c.      by diversifying the investments so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

d.      in accordance with the provisions of the Plan and the Trust.

86.     The Minnesota Prudent Investor Act ("PIA"), Minn. Stat. §501B.151 requires:

    a.   A trustee shall invest and manage trust assets as a prudent investor would, by considering the purposes, terms, distribution requirements, and other circumstances of the trust. In satisfying this standard, the trustee shall exercise reasonable care, skill, and caution; and

    b.   A trustee's investment and management decisions respecting individual assets must be evaluated not in isolation but in the context of the trust portfolio as a whole and as a part of an overall investment strategy having risk and return objectives reasonably suited to the trust.

87.    The PIA defines "trustee" as "individual trustees and corporations having trust powers acting under wills, agreements, court orders, and other instruments." Minn. Stat. §501B.151, Subd. 10.

88.    Pursuant to the Plan documents, the Board of Pensions controls and manages the operation and administration of the Retirement Plan and makes all decisions and determinations incident thereto, and is therefore the "trustee" of the Plan within the meaning of the PIA.

89.    The PIA also requires that "[a] trustee who has special skills or expertise, or is named trustee in reliance upon the trustee's representation that the trustee has special skills or expertise, has a duty to use those special skills or expertise."

90.    The Board of Pensions breached its fiduciary duties owed to Plaintiffs and the Class by:

    a.    failing to act with reasonable care to ensure that the investments in the Retirement Plan were suitable and in accordance with the Plan's investment goals and intentions;

b.      failing to invest Plaintiffs' and the Class' assets with adequate diligence or monitoring;

c.      failing to monitor external investment managers on an ongoing basis to any reasonable degree, or to comply with its own internal protocols for monitoring the Plan's assets entrusted to external investment managers;

d.      failing to maintain, protect, and preserve the trust corpus;

e.      failing to exercise the degree of prudence, diligence, and care expected of financial professionals managing client funds; and

f.      failing to use acquired special skills or expertise in managing and investing the Plan's assets.

91.     As a result of the Board of Pensions' breach of its fiduciary duties, Plaintiff and other members of the Class suffered and continue to suffer significant reductions in the amount of their monthly annuity payments.

92.     The damages suffered by the Class were a direct and foreseeable result, proximately caused by the Board of Pensions' breach of its fiduciary duties.

93.     As a result of the Board of Pensions' breach of fiduciary duties, the Class has suffered damages in an amount to be determined at trial.

**COUNT III: BREACH OF THE FIDUCIARY DUTY OF DISCLOSURE**
**(Against Both Defendants under Minnesota Common and Statutory Law)**

94.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

95.     During the Class Period, Defendants were fiduciaries of the Plan and *de facto* fiduciaries pursuant to Minnesota law. Pursuant to the Plan documents, Defendants control and manage the operation and administration of the ELCA Retirement Plan and make all decisions and determinations incident thereto.

96.     Defendants control over and management of the operation and administration of the Retirement Plan includes the creation of Plan documents which state the terms of the ELCA Retirement Plan.

97.     The scope of the fiduciary duties and responsibilities of Defendants include adequately and clearly communicating all terms of the ELCA Retirement Plan to Plaintiffs and the Class Members.

98.     If, as Defendants now contend, the annuity option was subject to market risk, Defendants breached their fiduciary duties owed to the Class by (a) failing to adequately or accurately disclose that risk, and (b) failing to act with reasonable care to ensure that the Plan documents adequately represented and disclosed all the material terms of the ELCA Retirement Plan and/or adequately disclosed that the Plan was subject to market risk.

99.     At all relevant times prior to June 2009, Defendants described payments under the annuity option as guaranteed for life and promised that all increases to those payments would be permanent. At no time were Plaintiffs or the Class Members informed that their "guaranteed" monthly payments or "permanent" increases to those payments could later be decreased or that their annuity payments were subject to risk.

100.   In about June 2009, however, Defendants for the first time characterized the annuity option as being subject to market risk, and that guaranteed monthly payments and permanent increases could be decreased by Defendants.  If the annuity option was subject to risk as Defendants first stated in June 2009, then Defendants failed to adequately or accurately disclose that risk to Plaintiffs and the Class Members.

101.   As a result of Defendants' breach of fiduciary duties, Plaintiffs and the Class Members committed assets to the ELCA Retirement Plan without being informed that their investments in the annuity option were subject to market risk and/or that their monthly payments were subject to decreases.

102.   The damages suffered by the Class were a direct and foreseeable result, proximately caused by Defendants' breach of their fiduciary duties.

103.   As a result of Defendants' breach of fiduciary duties, the Class has suffered damages in an amount to be determined at trial.

## COUNT IV: BREACH OF THE FIDUCIARY DUTY TO MONITOR
### (Against the Evangelical Lutheran Church in America under Minnesota Common and Statutory Law)

104.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

105.   During the Class Period, the ELCA was a fiduciary of the Plan and *de facto* fiduciary pursuant to Minnesota law with respect to its duty to elect Plan fiduciaries.

106.   ELCA Bylaw 17.61.03 requires that the presiding bishop of the ELCA, one bishop elected by the ELCA's Conference of Bishops, and the treasurer of the ELCA serve as advisory members of the Board of Pensions' Board of Trustees.

107.   Pursuant to ELCA Bylaw 17.61.06 "(i) the ELCA's presiding bishop and the Board of Pensions' Board of Trustees together elect the president of the Board of Pensions and arrange for his or her annual review; (ii) the ELCA's presiding bishop must approve the Board of Pensions' elected president and concur with his or her salary established by the Board of Pensions' Board of Trustees; and (iii) the ELCA's presiding bishop and the Board of Pensions' Board of Trustees may jointly terminate the Board of Pensions' president following recommendation by the executive committee of the ELCA Board of Pensions' Board of Trustees."

108.   The ELCA Constitution chapter 16.12 also provides that: "(1) the ELCA Board of Pensions shall be responsible to the Churchwide Assembly and will report to the ELCA Church Council in the interim and (2) the ELCA Board of Pensions policies, procedures, and operations shall be reviewed by the Church Council in order to assure conformity with the governing documents of this church and with Churchwide Assembly actions."

109.   As fiduciaries charged with electing the Plan's fiduciaries, the ELCA had a duty to monitor their appointees and/or electees.

110.   Pursuant to the ELCA Constitution, the ELCA also had a duty to review and/or monitor the Board of Pensions' policies, procedures and operations to assure they were in conformity with the governing documents (ie, the Plan documents) and with Churchwide Assembly actions.

111.   Defendants breached their fiduciary duties owed to Plaintiffs and the Class by failing to: (a) monitor their appointees and/or electees; (b) failing to review sufficient

information to satisfy themselves that the performance of the Plan's other fiduciaries was in compliance with their fiduciary duties and met the needs of the Plan; and/or (c) to review and or monitor the practices of the Board of Pensions in general to ensure the Board was executing its duties and responsibilities in managing the Plan in conformity with the Plan documents and investment guidelines as required by the ELCA Constitution.

112.   By failing to monitor the Board to ensure they met their duties to Plaintiffs and the Class Members and fulfilled the obligations of their contract with Plaintiffs and the Class Members, and by failing to review the actions and policies of the Board as required by the ELCA Constitution, the ELCA breached its fiduciary duty to monitor.

113.   As a result of the ELCA's breach of its fiduciary duties, Plaintiff and the Class Members suffered and continue to suffer significant reductions in the amount of their monthly annuity payments.

114.   The damages suffered by the Class were a direct and foreseeable result, proximately caused by Defendants' breach of their fiduciary duties.

115.   As a result of Defendants' breach of fiduciary duties, the Class has suffered damages in an amount to be determined at trial.

## VII.   PRAYER FOR RELIEF

Plaintiffs and the Class request the following relief:

116.   Certifying this action as a class action pursuant to Federal Rule of Civil Procedure 23;

117.   Awarding compensatory damages in favor of Plaintiffs and the other Class Members against Defendants for all damages sustained as a result of Defendants' breaches, in an amount to be proven at trial, including interest thereon;

118.   Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including Attorney fees;

119.   Enjoining Defendants from further breaching their duties, responsibilities, and obligations imposed on them by the Plan documents and state law;

120.   Entry of such orders or judgments as may be necessary to restore to any person in interest any money that may have been acquired by means of unlawful business acts and practices or to restore the value of an annuity fund to ensure Defendants are able meet their obligations; and

121.   Such equitable, injunctive or other relief as deemed appropriate by the Court.

## VIII.  <u>JURY DEMAND</u>

Plaintiffs demand trial by jury on their claims alleged.


Dated: August 22, 2011                    Respectfully submitted,

                                          *s/ Vincent J. Esades*
                                          Vincent J. Esades (MN #249361)
                                          Scott W. Carlson (MN #338400)
                                          **HEINS MILLS & OLSON, P.L.C.**
                                          310 Clifton Avenue
                                          Minneapolis, MN 55403
                                          Telephone:   (612) 338-4605
                                          Facsimile:   (612) 338-4692
                                          Email:       vesades@heinsmills.com
                                                       scarlson@heinsmills.com

Daniel R. Karon
**GOLDMAN SCARLATO & KARON, P.C.**
700 W. St. Clair Avenue, Suite 204
Cleveland, OH 44113
Telephone:   (216) 622-1851
Facsimile:   (216) 241-8175
Email:         karon@gsk-law.com

Paul J. Scarlato
Brian D. Penny
Laura Killian Mummert
**GOLDMAN SCARLATO & KARON, P.C.**
101 W. Elm Street Ste. 360
Conshohocken, PA 19428
Telephone:   (484) 342-0700
Facsimile:   (484) 342-0701
Email:         scarlato@gsk-law.com
                 penny@gsk-law.com
                 mummert@gsk-law.com

Brian Sund (MN #0198213)
Jackson Bigham (MN #0344102)
**MORRISON, FENSKE & SUND, P.A.**
5125 County Road 101, Suite 202
Minnetonka, MN 55345
Telephone:   (952) 975-0050
Facsimile:   (952)975-0058
Email:         bsund@morrisonfenske.com
                 jbigham@morrisonfenske.com

John S. Chapman
**JOHN S. CHAPMAN & ASSOCIATES, LLC**
700 W. St. Clair Avenue, Suite 204
Cleveland, OH 44113
Telephone:   (216) 241-8172
Facsimile:   (216) 241-8175
Email:         jchapman@jscltd.com

93276

Garrett D. Blanchfield (MN #0209855)
**REINHARDT WENDORF &
BLANCHFIELD**
E-1250 First Nat'l Bank Building
332 Minnesota Street
St. Paul, MN 55101
Telephone:   (651) 287-2100
Facsimile:   (651) 287-2103
Email:       g.blanchfield@rwblawfirm.com

*Attorneys for Plaintiffs and the Putative Class*