UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| PASTOR BENJAMIN A. JOHNSON, DR. RONALD A. LUNDEEN, and PASTOR ARTHUR F. HAIMERL on behalf of themselves and all others similarly situated, <br><br>Plaintiffs, <br><br>v. <br><br>EVANGELICAL LUTHERAN CHURCH IN AMERICA, AND THE BOARD OF PENSIONS OF THE EVANGELICAL LUTHERAN CHURCH IN AMERICA, <br><br>Defendants. | Court File No. 11-cv-00023 (MJD-LIB) <br><br>**DECLARATION OF DAVID G. ADAMS IN SUPPORT OF DEFENDANT BOARD OF PENSIONS OF THE EVANGELICAL LUTHERAN CHURCH IN AMERICA'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |

I, David G. Adams, declare as follows:

1. I have held the following roles in relation to the Board of Pensions of the Evangelical Lutheran Church in America (the "Board"):

    a) From 1988 through 1993, I worked as an outside consultant to the Board.

    b) From 1994 until the late 1990s, I was employed with the Board as Vice President of Finance. In this role, I was responsible for oversight of the Board's accounting group, internal audits, and the actuarial integrity of its products.

    c) In the late 1990s, I joined the Board's then-newly established Research and Design Department (later named the Products and

1

    Services Department), which was charged with design, rate setting, and maintenance of the actuarial integrity of all of the Board's benefit plans, including the ELCA Retirement Plan (the "Plan"). In this role, I was primarily responsible for management of the Board's retirement products and ensuring the financial soundness of those products.

  d) I retired from my role as Vice President of Products and Services on December 31, 2010. From January 1, 2011, through December 31, 2011, I served as a part-time employee consultant for the Board.

2. From my work in the above-described roles, I have personal knowledge of the factual information stated in this declaration except as otherwise indicated and, if called to testify, could testify truthfully and competently to the facts discussed below.

3. Before 1997, the Plan paid annuities from either 1) non-market value adjusted bond or balanced funds, which were not subject to downward adjustment to the base monthly benefit calculated at the inception of the annuity, or 2) equity funds, which were subject to upward and downward adjustments. The Board never decreased annuities paid from the non-market value adjusted bond or balanced funds. As of December 31, 1996, non-market value adjusted annuities ceased to exist. These annuities were transferred to the Annuity Fund and are therefore not at issue in this litigation.

4. The fund currently called the ELCA Annuity Fund ("Annuity Fund") was created in 1997. Since its inception, the Board has made annual adjustments to annuities paid from the Annuity Fund, partially based on a smoothing formula that was designed to

reduce volatility in the amounts of those payments. This formula combined the investment returns of the Annuity Fund from the immediately prior year with anticipated future returns and actuarial assumptions. My colleagues and I would apply the formula and make recommendations to the Board of Trustees as to the annual adjustments to the annuities. The Trustees determined the adjustments and would sometimes apply the formulaic result from the smoothing formula to determine the annual annuity adjustment. On other occasions, the Trustees overrode the smoothing formula's result based on discretionary considerations, such as volatility of the markets or the funded status of the Annuity Fund.

5. A member's initial annuity benefit was calculated based on the amount annuitized, the form of annuity elected, actuarial assumptions, and an assumed rate of investment return of 4.5%. Reserves are also calculated using a 4.5% assumed rate of return. To the extent that actual investment experience was more favorable than the assumed 4.5% assumed rate, the Board would approve discretionary adjustments to annuities in pay status using the above-described process. The Board annually distributed these adjustments to annuitants in one of two ways: (1) one-time payments (sometimes called dividends) that were paid as "13th checks" or added to the annuitant's 12 monthly annuity payments; or (2) permanent adjustments to the annuity that effectively annuitized the dividend.

6. Typically in about November of December of each year, the Board sent members letters announcing the interest crediting rate to be applied the following year. Based on my current recollection, the documents attached as Exhibits 1, 2 and 3 are

copies of the letters that the Board sent to members with bridge fund accounts announcing the interest crediting rates for 2007 (Exhibit 1, letter dated November 17, 2006), 2008 (Exhibit 2, letter dated November 21, 2007), and 2009 (Exhibit 3, letter dated December 2008).

7. Prior to the 2008 and 2009 market crisis, the application of the smoothing formula to determine discretionary adjustments always resulted in an interest crediting rate at or above the assumed 4.5% rate of return at which the initial annuity benefit was calculated. Thus, the amount of an annuitant's base annuity never decreased. Variations in any year's dividend, however, could make an annuitant's annual income lower than the amount that the individual received the year before.

8. Throughout my employment with the Board, the Board closely monitored the Annuity Fund's funded status to ensure that the Annuity Fund had adequate assets to support lifetime annuity payments. Based on my recollection and my review of records maintained in the ordinary course of the Board's business, as of December 31, 2007, the Annuity Fund was 96% funded. That funded ratio dropped sharply as a result of the 2008 and 2009 market crisis.

9. In 2009, the Board decided that it could not, as a prudent fiduciary, solely rely on hoped-for future investment gains to close the funding gap caused by the 2008 and 2009 market crisis. I made a number of presentations to the Trustees of the Board to inform their deliberations about how to implement an effective solution that would continue to provide income for life, while minimizing to the greatest extent possible the impact on annuitants' retirement income. The Board ultimately adopted a plan to make

downward annual adjustments over a three-year period in amounts necessary to bring the Annuity Fund's funded ratio to 100%.

10. While the Board announced a 9% reduction for 2010 and warned of similar expected reductions in 2011 and 2012 (and provided comparable announcement to Bridge Fund participants of a -3.5% interest crediting rate for 2010 and expected equivalent rates for 2011 and 2012), the Annuity Fund's actual investment returns allowed for smaller decreases (and higher interest crediting rates) in 2011 and 2012.

11. Attached as Exhibit 4 is a true and correct copy of a memorandum I prepared to Robert H. Rydland, dated May 29, 2009.

12. Attached as Exhibit 5 is a true and correct copy of a memorandum I prepared to the Board of Trustees and Leadership Team, dated September 15, 2009.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 10th day of September 2012, in Minnetrista, Minnesota.

_____
David G. Adams

DB2 23481110.3